# SCHMERBER v. CALIFORNIA.

No. 658. Argued April 25, 1966.—Decided June 20, 1966.

*Thomas M. McGurrin* argued the cause and filed a brief for petitioner.

*Edward L. Davenport* argued the cause for respondent. On the brief were *Roger Arnebergh* and *Philip E. Grey.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Petitioner was convicted in Los Angeles Municipal Court of the criminal offense of driving an automobile while under the influence of intoxicating liquor.[1] He had been arrested at a hospital while receiving treatment for injuries suffered in an accident involving the automobile that he had apparently been driving.[2] At the direction of a police officer, a blood sample was then withdrawn from petitioner's body by a physician at the hospital.

---

[1] California Vehicle Code § 23102 (a) provides, in pertinent part, "It is unlawful for any person who is under the influence of intoxicating liquor . . . to drive a vehicle upon any highway. . . ." The offense is a misdemeanor.

[2] Petitioner and a companion had been drinking at a tavern and bowling alley. There was evidence showing that petitioner was driving from the bowling alley about midnight November 12, 1964, when the car skidded, crossed the road and struck a tree. Both petitioner and his companion were injured and taken to a hospital for treatment.

The chemical analysis of this sample revealed a percent by weight of alcohol in his blood at the time of the offense which indicated intoxication, and the report of this analysis was admitted in evidence at the trial. Petitioner objected to receipt of this evidence of the analysis on the ground that the blood had been withdrawn despite his refusal, on the advice of his counsel, to consent to the test. He contended that in that circumstance the withdrawal of the blood and the admission of the analysis in evidence denied him due process of law under the Fourteenth Amendment, as well as specific guarantees of the Bill of Rights secured against the States by that Amendment: his privilege against self-incrimination under the Fifth Amendment; his right to counsel under the Sixth Amendment; and his right not to be subjected to unreasonable searches and seizures in violation of the Fourth Amendment. The Appellate Department of the California Superior Court rejected these contentions and affirmed the conviction.[3] In view of constitutional decisions since we last considered these issues in *Breithaupt* v. *Abram*, 352 U. S. 432—see *Escobedo* v. *Illinois*, 378 U. S. 478; *Malloy* v. *Hogan*, 378 U. S. 1, and *Mapp* v. *Ohio*, 367 U. S. 643—we granted certiorari. 382 U. S. 971. We affirm.

I.

THE DUE PROCESS CLAUSE CLAIM.

*Breithaupt* was also a case in which police officers caused blood to be withdrawn from the driver of an automobile involved in an accident, and in which there was ample justification for the officer's conclusion that the driver was under the influence of alcohol. There, as here, the extraction was made by a physician in a simple, medically acceptable manner in a hospital environment.

---

[3] This was the judgment of the highest court of the State in this proceeding since certification to the California District Court of Appeal was denied. See *Edwards* v. *California*, 314 U. S. 160.

There, however, the driver was unconscious at the time the blood was withdrawn and hence had no opportunity to object to the procedure. We affirmed the conviction there resulting from the use of the test in evidence, holding that under such circumstances the withdrawal did not offend "that 'sense of justice' of which we spoke in *Rochin* v. *California,* 342 U. S. 165." 352 U. S., at 435. *Breithaupt* thus requires the rejection of petitioner's due process argument, and nothing in the circumstances of this case [4] or in supervening events persuades us that this aspect of *Breithaupt* should be overruled.

## II.

### THE PRIVILEGE AGAINST SELF-INCRIMINATION CLAIM.

*Breithaupt* summarily rejected an argument that the withdrawal of blood and the admission of the analysis report involved in that state case violated the Fifth Amendment privilege of any person not to "be compelled in any criminal case to be a witness against himself," citing *Twining* v. *New Jersey,* 211 U. S. 78. But that case, holding that the protections of the Fourteenth Amendment do not embrace this Fifth Amendment privilege, has been succeeded by *Malloy* v. *Hogan,* 378 U. S. 1, 8. We there held that "[t]he Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will,

---

[4] We "cannot see that it should make any difference whether one states unequivocally that he objects or resorts to physical violence in protest or is in such condition that he is unable to protest." *Breithaupt* v. *Abram,* 352 U. S., at 441 (WARREN, C. J., dissenting). It would be a different case if the police initiated the violence, refused to respect a reasonable request to undergo a different form of testing, or responded to resistance with inappropriate force. Compare the discussion at Part IV, *infra.*

and to suffer no penalty . . . for such silence." We therefore must now decide whether the withdrawal of the blood and admission in evidence of the analysis involved in this case violated petitioner's privilege. We hold that the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature,[5] and that the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends.

It could not be denied that in requiring petitioner to submit to the withdrawal and chemical analysis of his blood the State compelled him to submit to an attempt to discover evidence that might be used to prosecute him for a criminal offense. He submitted only after the police officer rejected his objection and directed the physician to proceed. The officer's direction to the physician to administer the test over petitioner's objection constituted compulsion for the purposes of the privilege. The critical question, then, is whether petitioner was thus compelled "to be a witness against himself." [6]

---

[5] A dissent suggests that the report of the blood test was "testimonial" or "communicative," because the test was performed in order to obtain the testimony of others, communicating to the jury facts about petitioner's condition. Of course, all evidence received in court is "testimonial" or "communicative" if these words are thus used. But the Fifth Amendment relates only to acts on the part of the person to whom the privilege applies, and we use these words subject to the same limitations. A nod or head-shake is as much a' "testimonial" or "communicative" act in this sense as are spoken words. But the terms as we use them do not apply to evidence of acts noncommunicative in nature as to the person asserting the privilege, even though, as here, such acts are compelled to obtain the testimony of others.

[6] Many state constitutions, including those of most of the original Colonies, phrase the privilege in terms of compelling a person to give "evidence" against himself. But our decision cannot turn on the Fifth Amendment's use of the word "witness." "[A]s the

If the scope of the privilege coincided with the complex of values it helps to protect, we might be obliged to conclude that the privilege was violated. In *Miranda* v. *Arizona, ante,* at 460, the Court said of the interests protected by the privilege: "All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load' . . . to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." The withdrawal of blood necessarily involves puncturing the skin for extraction, and the percent by weight of alcohol in that blood, as established by chemical analysis, is evidence of criminal guilt. Compelled submission fails on one view to respect the "inviolability of the human personality." Moreover, since it enables the State to rely on evidence forced from the accused, the compulsion violates at least one meaning of the requirement that the State procure the evidence against an accused "by its own independent labors."

As the passage in *Miranda* implicitly recognizes, however, the privilege has never been given the full scope which the values it helps to protect suggest. History

manifest purpose of the constitutional provisions, both of the States and of the United States, is to prohibit the compelling of testimony of a self-incriminating kind from a party or a witness, the liberal construction which must be placed upon constitutional provisions for the protection of personal rights would seem to require that the constitutional guaranties, however differently worded, should have as far as possible the same interpretation . . . ." *Counselman* v. *Hitchcock,* 142 U. S. 547, 584–585. 8 Wigmore, Evidence § 2252 (McNaughton rev. 1961).

and a long line of authorities in lower courts have consistently limited its protection to situations in which the State seeks to submerge those values by obtaining the evidence against an accused through "the cruel, simple expedient of compelling it from his own mouth. . . .   In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' " *Ibid.*   The leading case in this Court is *Holt* v. *United States,* 218 U. S. 245.   There the question was whether evidence was admissible that the accused, prior to trial and over his protest, put on a blouse that fitted him. It was contended that compelling the accused to submit to the demand that he model the blouse violated the privilege.   Mr. Justice Holmes, speaking for the Court, rejected the argument as "based upon an extravagant extension of the Fifth Amendment," and went on to say: "[T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material.   The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof." 218 U. S., at 252–253.[7]

It is clear that the protection of the privilege reaches an accused's communications, whatever form they might

---

[7] Compare Wigmore's view, "that the privilege is limited to testimonial disclosures.   It was directed at the employment of legal process to *extract from the person's own lips* an admission of guilt, which would thus take the place of other evidence." 8 Wigmore, Evidence § 2263 (McNaughton rev. 1961).   California adopted the Wigmore formulation in *People* v. *Trujillo,* 32 Cal. 2d 105, 194 P. 2d 681 (1948); with specific regard to blood tests, see *People* v. *Haeussler,* 41 Cal. 2d 252, 260 P. 2d 8 (1953); *People* v. *Duroncelay,* 48 Cal. 2d 766, 312 P. 2d 690 (1957).   Our holding today, however, is not to be understood as adopting the Wigmore formulation.

take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. *Boyd* v. *United States,* 116 U. S. 616. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.[8] The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it.

Although we agree that this distinction is a helpful framework for analysis, we are not to be understood to agree with past applications in all instances. There will be many cases in which such a distinction is not readily drawn. Some tests seemingly directed to obtain "physical evidence," for example, lie detector tests measuring changes in body function during interrogation, may actually be directed to eliciting responses which are essentially testimonial. To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment. Such situations call to mind the principle that the protection of the privilege "is as broad as the mischief against which it seeks to guard," *Counselman* v. *Hitchcock,* 142 U. S. 547, 562.

---

[8] The cases are collected in 8 Wigmore, Evidence § 2265 (McNaughton rev. 1961). See also *United States* v. *Chibbaro,* 361 F. 2d 365 (C. A. 3d Cir. 1966); *People* v. *Graves,* 64 Cal. 2d 208, —, 411 P. 2d 114, 116 (1966); Weintraub, Voice Identification, Writing Exemplars and the Privilege Against Self-Incrimination, 10 Vand. L. Rev. 485 (1957).

In the present case, however, no such problem of application is presented. Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis. Petitioner's testimonial capacities were in no way implicated; indeed, his participation, except as a donor, was irrelevant to the results of the test, which depend on chemical analysis and on that alone.[9] Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds.

## III.

### THE RIGHT TO COUNSEL CLAIM.

This conclusion also answers petitioner's claim that, in compelling him to submit to the test in face of the fact that his objection was made on the advice of counsel,

---

[9] This conclusion would not necessarily govern had the State tried to show that the accused had incriminated himself when told that he would have to be tested. Such incriminating evidence may be an unavoidable by-product of the compulsion to take the test, especially for an individual who fears the extraction or opposes it on religious grounds. If it wishes to compel persons to submit to such attempts to discover evidence, the State may have to forgo the advantage of any *testimonial* products of administering the test—products which would fall within the privilege. Indeed, there may be circumstances in which the pain, danger, or severity of an operation would almost inevitably cause a person to prefer confession to undergoing the "search," and nothing we say today should be taken as establishing the permissibility of compulsion in that case. But no such situation is presented in this case. See text at n. 13 *infra*.

Petitioner has raised a similar issue in this case, in connection with a police request that he submit to a "breathalyzer" test of air expelled from his lungs for alcohol content. He refused the request, and evidence of his refusal was admitted in evidence without objection. He argues that the introduction of this evidence and a comment by the prosecutor in closing argument upon his refusal is

he was denied his Sixth Amendment right to the assistance of counsel. Since petitioner was not entitled to assert the privilege, he has no greater right because counsel erroneously advised him that he could assert it. His claim is strictly limited to the failure of the police to respect his wish, reinforced by counsel's advice, to be left inviolate. No issue of counsel's ability to assist petitioner in respect of any rights he did possess is presented. The limited claim thus made must be rejected.

## IV.
### The Search and Seizure Claim.

In *Breithaupt,* as here, it was also contended that the chemical analysis should be excluded from evidence as the product of an unlawful search and seizure in violation of the Fourth and Fourteenth Amendments. The Court did not decide whether the extraction of blood in that case was unlawful, but rejected the claim on the basis of *Wolf* v. *Colorado,* 338 U. S. 25. That case had held that the Constitution did not require, in state prosecutions for state crimes, the exclusion of evidence obtained in violation of the Fourth Amendment's provisions. We have since overruled *Wolf* in that respect, holding in *Mapp* v. *Ohio,* 367 U. S. 643, that the exclusionary rule adopted for federal prosecutions in *Weeks* v. *United States,* 232 U. S. 383, must also be applied in criminal prosecutions in state courts. The question is squarely presented therefore, whether the chemical anal-

---

ground for reversal under *Griffin* v. *California,* 380 U. S. 609. We think general Fifth Amendment principles, rather than the particular holding of *Griffin,* would be applicable in these circumstances, see *Miranda* v. *Arizona, ante,* at 468, n. 37. Since trial here was conducted after our decision in *Malloy* v. *Hogan, supra,* making those principles applicable to the States, we think petitioner's contention is foreclosed by his failure to object on this ground to the prosecutor's question and statements.

ysis introduced in evidence in this case should have been excluded as the product of an unconstitutional search and seizure.

The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State. In *Wolf* we recognized "[t]he security of one's privacy against arbitrary intrusion by the police" as being "at the core of the Fourth Amendment" and "basic to a free society." 338 U. S., at 27. We reaffirmed that broad view of the Amendment's purpose in applying the federal exclusionary rule to the States in *Mapp*.

The values protected by the Fourth Amendment thus substantially overlap those the Fifth Amendment helps to protect. History and precedent have required that we today reject the claim that the Self-Incrimination Clause of the Fifth Amendment requires the human body in all circumstances to be held inviolate against state expeditions seeking evidence of crime. But if compulsory administration of a blood test does not implicate the Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment. That Amendment expressly provides that "[t]he right of the people to be secure in their *persons,* houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." (Emphasis added.) It could not reasonably be argued, and indeed respondent does not argue, that the administration of the blood test in this case was free of the constraints of the Fourth Amendment. Such testing procedures plainly constitute searches of "persons," and depend antecedently upon seizures of "persons," within the meaning of that Amendment.

Because we are dealing with intrusions into the human body rather than with state interferences with property relationships or private papers—"houses, papers, and

effects"—we write on a clean slate. Limitations on the kinds of property which may be seized under warrant,[10] as distinct from the procedures for search and the permissible scope of search,[11] are not instructive in this context. We begin with the assumption that once the privilege against self-incrimination has been found not to bar compelled intrusions into the body for blood to be analyzed for alcohol content, the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. In other words, the questions we must decide in this case are whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness.

In this case, as will often be true when charges of driving under the influence of alcohol are pressed, these questions arise in the context of an arrest made by an officer without a warrant. Here, there was plainly probable cause for the officer to arrest petitioner and charge him with driving an automobile while under the influence of intoxicating liquor.[12] The police officer who arrived

---

[10] See, e. g., Gouled v. United States, 255 U. S. 298; Boyd v. United States, 116 U. S. 616; contra, People v. Thayer, 63 Cal. 2d 635, 408 P. 2d 108 (1965); State v. Bisaccia, 45 N. J. 504, 213 A. 2d 185 (1965); Note, Evidentiary Searches: The Rule and the Reason, 54 Geo. L. J. 593 (1966).

[11] See, e. g., Silverman v. United States, 365 U. S. 505; Abel v. United States, 362 U. S. 217, 235; United States v. Rabinowitz, 339 U. S. 56.

[12] California law authorizes a peace officer to arrest "without a warrant . . . [w]henever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." Cal. Penal Code § 836.3. Although petitioner was ultimately prosecuted for a misdemeanor,

at the scene shortly after the accident smelled liquor on petitioner's breath, and testified that petitioner's eyes were "bloodshot, watery, sort of a glassy appearance." The officer saw petitioner again at the hospital, within two hours of the accident. There he noticed similar symptoms of drunkenness. He thereupon informed petitioner "that he was under arrest and that he was entitled to the services of an attorney, and that he could remain silent, and that anything that he told me would be used against him in evidence."

While early cases suggest that there is an unrestricted "right on the part of the Government, always recognized under English and American law, to search the person of the accused when legally arrested to discover and seize the fruits or evidences of crime," *Weeks* v. *United States,* 232 U. S. 383, 392; *People* v. *Chiagles,* 237 N. Y. 193, 142 N. E. 583 (1923) (Cardozo, J.), the mere fact of a lawful arrest does not end our inquiry. The suggestion of these cases apparently rests on two factors—first, there may be more immediate danger of concealed weapons or of destruction of evidence under the direct control of the accused, *United States* v. *Rabinowitz,* 339 U. S. 56, 72–73 (Frankfurter, J., dissenting); second, once a search of the arrested person for weapons is permitted, it would be both impractical and unnecessary to enforcement of the Fourth Amendment's purpose to attempt to confine the search to those objects alone. *People* v. *Chiagles,* 237 N. Y., at 197–198, 142 N. E., at 584. Whatever the validity of these considerations in general, they have little applicability with respect to searches involving intrusions beyond the body's surface. The interests in

he was subject to prosecution for the felony since a companion in his car was injured in the accident, which apparently was the result of traffic law violations. Cal. Vehicle Code § 23101. California's test of probable cause follows the federal standard. *People* v. *Cockrell,* 63 Cal. 2d 659, 408 P. 2d 116 (1965).

human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

Although the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of petitioner's blood for alcohol, the question remains whether the arresting officer was permitted to draw these inferences himself, or was required instead to procure a warrant before proceeding with the test. Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned. The requirement that a warrant be obtained is a requirement that the inferences to support the search "be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States,* 333 U. S. 10, 13–14; see also *Aguilar* v. *Texas,* 378 U. S. 108, 110–111. The importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great.

The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened "the destruction of evidence," *Preston* v. *United States,* 376 U. S. 364, 367. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had

to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

Similarly, we are satisfied that the test chosen to measure petitioner's blood-alcohol level was a reasonable one. Extraction of blood samples for testing is a highly effective means of determining the degree to which a person is under the influence of alcohol. See *Breithaupt* v. *Abram,* 352 U. S., at 436, n. 3. Such tests are a commonplace in these days of periodic physical examinations [13] and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no risk, trauma, or pain. Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing, such as the "breathalyzer" test petitioner refused, see n. 9, *supra.* We need not decide whether such wishes would have to be respected.[14]

Finally, the record shows that the test was performed in a reasonable manner. Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most

[13] "The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors." *Breithaupt* v. *Abram,* 352 U. S., at 436.

[14] See Karst, Legislative Facts in Constitutional Litigation, 1960 Sup. Ct. Rev. 75, 82–83.

rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.

We thus conclude that the present record shows no violation of petitioner's right under the Fourth and Fourteenth Amendments to be free of unreasonable searches and seizures. It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

*Affirmed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, concurring.

In joining the Court's opinion I desire to add the following comment. While agreeing with the Court that the taking of this blood test involved no testimonial compulsion, I would go further and hold that apart from this consideration the case in no way implicates the Fifth Amendment. Cf. my dissenting opinion and that of MR. JUSTICE WHITE in *Miranda* v. *Arizona, ante,* pp. 504, 526.

MR. CHIEF JUSTICE WARREN, dissenting.

While there are other important constitutional issues in this case, I believe it is sufficient for me to reiterate my dissenting opinion in *Breithaupt* v. *Abram,* 352 U. S. 432, 440, as the basis on which to reverse this conviction.

MR. JUSTICE BLACK with whom MR. JUSTICE DOUGLAS joins, dissenting.

I would reverse petitioner's conviction. I agree with the Court that the Fourteenth Amendment made applicable to the States the Fifth Amendment's provision that "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." But I disagree with the Court's holding that California did not violate petitioner's constitutional right against self-incrimination when it compelled him, against his will, to allow a doctor to puncture his blood vessels in order to extract a sample of blood and analyze it for alcoholic content, and then used that analysis as evidence to convict petitioner of a crime.

The Court admits that "the State compelled [petitioner] to submit to an attempt to discover evidence [in his blood] that might be [and was] used to prosecute him for a criminal offense." To reach the conclusion that compelling a person to give his blood to help the State convict him is not equivalent to compelling him to be a witness against himself strikes me as quite an extraordinary feat. The Court, however, overcomes what had seemed to me to be an insuperable obstacle to its conclusion by holding that

> ". . . the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends." (Footnote omitted.)

I cannot agree that this distinction and reasoning of the Court justify denying petitioner his Bill of Rights' guarantee that he must not be compelled to be a witness against himself.

In the first place it seems to me that the compulsory extraction of petitioner's blood for analysis so that the person who analyzed it could give evidence to convict him had both a "testimonial" and a "communicative nature." The sole purpose of this project which proved to be successful was to obtain "testimony" from some person to prove that petitioner had alcohol in his blood at the time he was arrested. And the purpose of the project was certainly "communicative" in that the analysis of the blood was to supply information to enable a witness to communicate to the court and jury that petitioner was more or less drunk.

I think it unfortunate that the Court rests so heavily for its very restrictive reading of the Fifth Amendment's privilege against self-incrimination on the words "testimonial" and "communicative." These words are not models of clarity and precision as the Court's rather labored explication shows. Nor can the Court, so far as I know, find precedent in the former opinions of this Court for using these particular words to limit the scope of the Fifth Amendment's protection. There is a scholarly precedent, however, in the late Professor Wigmore's learned treatise on evidence. He used "testimonial" which, according to the latest edition of his treatise revised by McNaughton, means "communicative" (8 Wigmore, Evidence § 2263 (McNaughton rev. 1961), p. 378), as a key word in his vigorous and extensive campaign designed to keep the privilege against self-incrimination "within limits the strictest possible." 8 Wigmore, Evidence § 2251 (3d ed. 1940), p. 318. Though my admiration for Professor Wigmore's scholarship is great, I regret to see the word he used to narrow the Fifth Amendment's protection play such a major part in any of this Court's opinions.

I am happy that the Court itself refuses to follow Professor Wigmore's implication that the Fifth Amend-

ment goes no further than to bar the use of forced self-incriminating statements coming from a "person's own lips." It concedes, as it must so long as *Boyd* v. *United States*, 116 U. S. 616, stands, that the Fifth Amendment bars a State from compelling a person to produce papers he has that might tend to incriminate him. It is a strange hierarchy of values that allows the State to extract a human being's blood to convict him of a crime because of the blood's content but proscribes compelled production of his lifeless papers. Certainly there could be few papers that would have any more "testimonial" value to convict a man of drunken driving than would an analysis of the alcoholic content of a human being's blood introduced in evidence at a trial for driving while under the influence of alcohol. In such a situation blood, of course, is not oral testimony given by an accused but it can certainly "communicate" to a court and jury the fact of guilt.

The Court itself, at page 764, expresses its own doubts, if not fears, of its own shadowy distinction between compelling "physical evidence" like blood which it holds does not amount to compelled self-incrimination, and "eliciting responses which are essentially testimonial." And in explanation of its fears the Court goes on to warn that

> "To compel a person to submit to testing [by lie detectors for example] in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and history of the Fifth Amendment. Such situations call to mind the principle that the protection of the privilege 'is as broad as the mischief against which it seeks to guard.' *Counselman* v. *Hitchcock*, 142 U. S. 547, 562."

A basic error in the Court's holding and opinion is its failure to give the Fifth Amendment's protection against

compulsory self-incrimination the broad and liberal construction that *Counselman* and other opinions of this Court have declared it ought to have.

The liberal construction given the Bill of Rights' guarantee in *Boyd* v. *United States, supra,* which Professor Wigmore criticized severely, see 8 Wigmore, Evidence, § 2264 (3d ed. 1940), pp. 366–373, makes that one among the greatest constitutional decisions of this Court. In that case, at 634–635, all the members of the Court decided that civil suits for penalties and forfeitures incurred for commission of offenses against the law,

> ". . . are within the reason of criminal proceedings for all the purposes of . . . that portion of the Fifth Amendment which declares that no person shall be compelled in any criminal case to be a witness against himself; . . . within the meaning of the Fifth Amendment to the Constitution . . . ." *

Obviously the Court's interpretation was not completely supported by the literal language of the Fifth Amendment. Recognizing this, the Court announced a rule of constitutional interpretation that has been generally followed ever since, particularly in judicial construction of Bill of Rights guarantees:

> "A close and literal construction [of constitutional provisions for the security of persons and property] deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroach-

---

*A majority of the Court applied the same constitutional interpretation to the search and seizure provisions of the Fourth Amendment over the dissent of Mr. Justice Miller, concurred in by Chief Justice Waite.

ments thereon." *Boyd* v. *United States, supra,* at 635.

The Court went on to say, at 637, that to require "an owner to produce his private books and papers, in order to prove his breach of the laws, and thus to establish the forfeiture of his property, is surely compelling him to furnish evidence against himself." The Court today departs from the teachings of *Boyd.* Petitioner Schmerber has undoubtedly been compelled to give his blood "to furnish evidence against himself," yet the Court holds that this is not forbidden by the Fifth Amendment. With all deference I must say that the Court here gives the Bill of Rights' safeguard against compulsory self-incrimination a construction that would generally be considered too narrow and technical even in the interpretation of an ordinary commercial contract.

The Court apparently, for a reason I cannot understand, finds some comfort for its narrow construction of the Fifth Amendment in this Court's decision in *Miranda* v. *Arizona, ante,* p. 436. I find nothing whatever in the majority opinion in that case which either directly or indirectly supports the holding in this case. In fact I think the interpretive constitutional philosophy used in *Miranda,* unlike that used in this case, gives the Fifth Amendment's prohibition against compelled self-incrimination a broad and liberal construction in line with the wholesome admonitions in the *Boyd* case. The closing sentence in the Fifth Amendment section of the Court's opinion in the present case is enough by itself, I think, to expose the unsoundness of what the Court here holds. That sentence reads:

"Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds."

How can it reasonably be doubted that the blood test evidence was not in all respects the actual equivalent of "testimony" taken from petitioner when the result of the test was offered as testimony, was considered by the jury as testimony, and the jury's verdict of guilt rests in part on that testimony? The refined, subtle reasoning and balancing process used here to narrow the scope of the Bill of Rights' safeguard against self-incrimination provides a handy instrument for further narrowing of that constitutional protection, as well as others, in the future. Believing with the Framers that these constitutional safeguards broadly construed by independent tribunals of justice provide our best hope for keeping our people free from governmental oppression, I deeply regret the Court's holding. For the foregoing reasons as well as those set out in concurring opinions of BLACK and DOUGLAS, JJ., in *Rochin* v. *California*, 342 U. S. 165, 174, 177, and my concurring opinion in *Mapp* v. *Ohio*, 367 U. S. 643, 661, and the dissenting opinions in *Breithaupt* v. *Abram*, 352 U. S. 432, 440, 442, I dissent from the Court's holding and opinion in this case.

MR. JUSTICE DOUGLAS, dissenting.

I adhere to the views of THE CHIEF JUSTICE in his dissent in *Breithaupt* v. *Abram*, 352 U. S. 432, 440, and to the views I stated in my dissent in that case (*id.*, 442) and add only a word.

We are dealing with the right of privacy which, since the *Breithaupt* case, we have held to be within the penumbra of some specific guarantees of the Bill of Rights. *Griswold* v. *Connecticut*, 381 U. S. 479. Thus, the Fifth Amendment marks "a zone of privacy" which the Government may not force a person to surrender. *Id.*, 484. Likewise the Fourth Amendment recognizes that right when it guarantees the right of the people to be

secure "in their persons." *Ibid*. No clearer invasion of this right of privacy can be imagined than forcible blood-letting of the kind involved here.

MR. JUSTICE FORTAS, dissenting.

I would reverse. In my view, petitioner's privilege against self-incrimination applies. I would add that, under the Due Process Clause, the State, in its role as prosecutor, has no right to extract blood from an accused or anyone else, over his protest. As prosecutor, the State has no right to commit any kind of violence upon the person, or to utilize the results of such a tort, and the extraction of blood, over protest, is an act of violence. Cf. CHIEF JUSTICE WARREN's dissenting opinion in *Breithaupt* v. *Abram,* 352 U. S. 432, 440.