## STATE OF NEW JERSEY, IN THE INTEREST OF M. P. C., A JUVENILE.

Juvenile and Domestic Relations Court
Bergen County

September 16, 1977.

*Ms. Marilyn Clark,* Assistant Prosecutor for the State (*Mr. Roger Breslin, Jr.,* Bergen County Prosecutor, attorney).

*Mr. Robert M. Biagotti* for the Juvenile (*Mr. Donald R. Conway,* attorney).

*Mr. Alexander P. Waugh, Jr.* for The Society of the Valley Hospital (*Messrs. Riker, Danzig, Scherer & Debevoise,* attorneys).

ROSENBERG, J. J. D. R. C. Defendant is charged with juvenile delinquency in causing the death of another by driving a vehicle carelessly and heedlessly, in willful or wanton disregard of the rights or safety of the decedent, in violation of *N. J. S. A.* 2A:113–9, *N. J. S. A.* 2A:4–44b. Although a minor, defendant is a licensed driver necessarily over the age of 17 and was entitled, at his election, to trial in the criminal court with the availability of trial by jury. He has, however, elected to be tried in the Juvenile Court wherein there is no provision for trial by jury. *N. J. S. A.* 2A:4–60.

This is a motion by the State directed to defendant and The Society of the Valley Hospital (of Ridgewood, hereinafter hospital) to secure the results of an alcohol blood level test performed by that hospital. Defendant refuses to allow the hospital to release the results, contending that they are privileged under *N. J. S. A.* 2A:84A–22.2 *et seq.* The hospital states that it will abide by the order of this court.

Prior to this event there was and still is in existence a written agreement between the County of Bergen and the hospital pursuant to which the hospital agreed to take blood level samples of alcohol or other serious drugs and submit them for testing by the police where the efficient administration of justice required that blood alcohol samples be taken from persons arrested for unlawful conduct related to or arising from the use of said alcohol or drugs. The parties have stipulated the existence of the agreement. The agreement further provides that the arresting officer must complete a "Police Blood Sample Request Form" (noted as being available in the hospital's emergency room) prior to the sample being taken. A copy of the request form is annexed to the agreement and it is explicitly stated in said form that the name of the arresting officer, his department,

the date, time and place of arrest as well as the law violated be set forth therein.

On March 5, 1977, Lieutenant Milliken and Patrolman Mulcahey of the Village of Ridgewood were on duty in separate patrol cars, and at about 2:20 A.M., as a result of a radio direction from headquarters, both went to the area of Maple Avenue and Stillwell Place in Ridgewood and there observed a Ford Mustang in contact with a utility pole, with extensive damage to the front and operator's side of the vehicle. Maple Avenue is a north and south thoroughfare and the vehicle was on the easterly lane thereof facing oncoming traffic. It was clearly on the wrong side of the road and no skid marks were observed by either officer. A person was seated in the passenger side of the vehicle in a semi-conscious condition, partially incoherent and suffering from facial cuts. There was no one in the operator's side of the vehicle, and after an unsuccessful search for this person in the bushes, the officers noticed a motor van on the opposite side of the street facing south occupied by a person in the operator's seat with another person sitting next to him. Upon the approach of the police, the latter emerged from the vehicle bleeding from the upper side of his face. Mulcahey noted a heavy odor of alcohol emanating from this person, who walked from side to side, his legs apparently not supporting him. The assistance of both officers was required to lead and seat him in one of the patrol cars. Milliken likewise testified that this person emitted a heavy odor of alcohol, that he staggered across the road to the police car and that his speech was slurred. The person admitted that he was the operator of the Mustang, had been drinking and that he was aware that he had hit something, the nature of which he did not know.

In the opinion of both officers, the operator of the Ford Mustang was intoxicated and unfit to operate a motor vehicle as a result thereof. Later on at police headquarters the operator produced his driver's license.

This person (defendant herein) and his passenger were taken by ambulance to the hospital emergency room, defendant being removed from the police car for this purpose. Dr. Robert Staub, then in attendance, first examined the passenger. Defendant was also in the room on a stretcher. Milliken testified that he then requested from Supervising Nurse Pennise, then also present, that a blood sample be taken of defendant. This request was made in the presence of Mulcahey. Nurse Pennise allegedly refused to comply on two grounds: first, that defendant was a minor and parental consent was essential (defendant's mother later on refused to grant consent) and second, the police had not produced a warrant for the arrest of defendant. Milliken testified that he advised Nurse Pennise that a drunk driving charge was to be made, that no arrest was contemplated, but that he had in fact placed defendant under arrest at the scene and that he would complete any forms required by the agreement aforesaid. Nurse Pennise responded that she was aware of the agreement and its requirements, but nevertheless refused to grant the blood sample because of lack of parental consent, and in her opinion a motor vehicle violation did not in itself constitute the arrest postulated by the agreement.

During the course of her later testimony Nurse Pennise modified her position relative to the legal prerequisite of parental consent, stating that her refusal was predicated purely on the humanitarian basis that defendant was a minor. She further testified that Milliken did not at any time categorically state that defendant was actually under arrest. The basis for the obvious confusion as to the meaning of the word "arrest," as set forth in the agreement and request form, was suggested in the testimony of Nurse O'Brien, who explained that in her understanding, proof of an "arrest" would have been effected had the police produced the original or copy of a motor vehicle summons and complaint. Apparently the nurse would have been satisfied had some tangible written evidence of a motor vehicle violation been submitted. In this respect it is significant that,

according to Milliken, the summons and complaint charging defendant with drunk driving was not prepared until 5:30 or 6 A.M., later that morning. No warrant for defendant's arrest was ever issued nor was he detained after his examination at the hospital — this although Mulcahey testified that he again placed defendant under arrest at the hospital emergency room, admitting, however, that defendant was unconscious at the time.

Mulcahey's version of the performance of the required procedure and arrest is somewhat inconclusive. He originally stated that defendant was put under arrest at the scene, then allegedly advising Nurse Pennise that no arrest was contemplated, but merely the issuance of a motor vehicle summons and complaint, and that he again put defendant under arrest at the hospital (this, as previously stated, was while defendant was unconscious). Finally, Mulcahey stated that in his opinion an arrest merely meant that there was enough evidence upon which to make a complaint. It is clear factually, however, that at no time from the placing of defendant in the police car was he at liberty to leave, and as stated in *Strelecki v. Coan*, 97 *N. J. Super.* 279 (App. Div. 1967):

Officers are not required to make any formal declaration of arrest or apply manual force in order to "arrest" a person. An arrest may be accomplished by any act that indicates an intention to take the person into custody and subject him to the control and will of the person making the arrest. [at 283]

Furthermore, as stated in *State v. McMaster*, 118 *N. J. Super.* 476 (App. Div. 1972):

Defendant also seeks to sustain the order of suppression below by claiming that the blood test involved here was not performed as an incident of a lawful arrest. The argument is frivolous in view of the decision of the Supreme Court in *Schmerber*, above. See 384 *U. S.* at 770, 86 *S. Ct.* at 1835, 16 *L. Ed. 2d* at 919. It is elementary that the alcoholic content of human blood begins to diminish after drinking stops. The officer was obviously confronted with an emergency. [at 479]

It is clear from the testimony of Mulcahey, Milliken and Nurses Pennise and O'Brien that the failure to supply the blood sample was predicated upon the completely understandable lack of knowledge of the nurses as to the process and rights of police officers when individuals are taken into custody for violation of the drunk driving statute, and the use of the specific word "arrest" in the agreement was the basis of additional confusion to the nurses. There is no evidence that the nurses were aware that *N. J. S. A.* 39:4-50.2 provides for the nonconsensual test of *any* person who operates a motor vehicle on any public road and that consent is essential only when breath samples are taken.

In *Schmerber v. California,* 384 *U. S.* 757, 86 *S. Ct.* 1826, 16 *L. Ed.* 2d 908 (1966) the court held that blood samples taken in an approved technique and appropriate environment of a defendant similarly charged as herein were admissible as nontestimonial in nature and not violative of any of the provisions of the Bill of Rights or the due process clause of the Federal Constitution. *State v. Macuk,* 57 *N. J.* 1 (1970), follows this pronouncement. Although both *Schmerber* and *Macuk* mention the existence of an arrest as an apparent preliminary requisite, this requirement was not considered vital in cases of emergency to assure the State against the loss of evidence. *State v. Tolbert,* 100 *N. J. Super.* 350 (Cty. Ct. 1968), and *State v. McMaster, supra.* The emergent circumstances in the matter before us were apparent. Indeed, although the evidence herein indicates that defendant did not object to the taking of the blood sample by Dr. Staub, it has been held that such sample taken at the request of a police officer while the accused was unconscious did not necessarily render the taking violative of a constitutional right. *State v. Tolbert, supra.* It is clear that the phraseology of the agreement utilizing the word "arrest" despite the decisions supporting blood tests without the necessity of such technical custodial act were understandably productive of confusion in the minds of the nurses who obviously were not tutored or

required to be knowledgeable in the niceties of the law pertinent to the situation.

Dr. Staub testified that he was on emergency duty at the hospital and examined defendant between 2:30 and 2:40 A.M. that morning. He noted superficial abrasions on his forehead, contusions over his right lower ribs and lacerations on his right lower leg. Defendant appeared sleepy and confused but denied having anything to drink. Dr. Staub, however, detected a light to moderate aroma which suggested "alcohol." The aroma was not so overwhelming in itself to necessitate a blood alcohol test. For diagnostic purposes, however, Dr. Staub ordered a urinalysis, blood count and blood alcohol test as well. The latter test was deemed essential because if there was in fact a high level of alcohol in the blood, a different basis for the neurological symptoms exhibited would thus be manifested; absence of a high blood level of alcohol would indicate another form of neurological involvement and requisite other treatment therefor. Dr. Staub asserted that the entire series of tests he ordered including the blood sample were diagnostically essential, predicated upon defendant's inconclusive symptoms.

■ ■ Assuming, however, that the hospital erred in not providing the blood samples at the request of the police and that defendant's mother was equally not justified in disallowing the taking of the sample, these circumstances *alone* would not justify depriving defendant of his privilege since there is no evidence that he in any way authorized said refusals. It is also clear that the series of tests performed by Dr. Staub, including the blood alcohol level, were for diagnostic and treatment purposes only and as such within the purview of the privilege. *Cf. State of Washington v. Kuljis, 70 Wash.* 2d 168, 422 *P.* 2d 480 (1967), wherein the test was performed at the request of the police for the sole purpose of determining the amount of alcohol in defendant's blood.

It is submitted, however, that defendant should be denied the privilege, irrespective of the purely diagnostic approach

of Dr. Staub, because the granting of the privilege could, in view of the existing evidence of unlawful conduct on the part of defendant, permit concealment of additional evidence relevant to the prosecution of the State's case.

Apparently the only case in this State dealing directly with the availability of the physician-patient privilege involving a factual situation comparable to the one herein is *State v. Amaniera*, 132 *N. J. Super.* 597 (Cty. Ct. 1974). There the defendant was indicted for causing a death by auto while under the influence of an intoxicating beverage. The police transported him to a hospital for medical attention. He was examined by a qualified neurosurgeon, who observed that the defendant was bleeding from his left ear and emitted the odor of alcohol. The doctor also ascertained that defendant had been drinking. The doctor ordered that a blood alcohol test be taken in order to determine whether defendant's symptoms and physical condition resulted from the trauma occasioned by the event or from the ingestion of alcohol. The purpose of the test was purely to establish a basis for medical treatment. Sometime after the doctor had ordered the test (and it presumably had already been effected) the police appeared and requested that the same test be performed for prosecutorial use. The doctor informed the police that he had already ordered the test, and apparently, since the defendant was then being treated, refused to take another sample. The court in *Amaniera* held that the results of the test were privileged because the doctor, in providing for the taking of the blood sample, was not acting for the police but for purely diagnostic and medically motivated purposes. At this juncture it would initially appear that the *Amaniera* case and the instant matter are on all fours and that the privilege asserted by defendant herein should be granted. This court, however, is of the opinion that the exception to the privilege as set forth in *N. J. S. A.* 2A:84A–22.6 (not adverted to in *Amaniera*) necessitates the denial of the privilege. This exception provides as follows:

No person has a privilege under this act if the judge finds that sufficient evidence, aside from the communication has been introduced to warrant a finding that the services of the physician were sought or obtained to enable or aid anyone to commit or to plan to commit a crime or a tort, or to escape detection or apprehension after the commission of a crime or a tort.

This difference of opinion is deemed permissible since this court and the court in *Amaniera* are of equal trial level. *State v. Hudes,* 128 *N. J. Super.* 589 (Cty. Ct. 1974). The court in *Amaniera* cites *Alder v. State,* 239 *Ind.* 68, 154 *N. E.* 2d 716 (Sup. Ct. 1955), in support of its position. It is to be noted that the statute in the *Alder* case either did not possess the exception hereinbefore mentioned or made no reference thereto, if in fact it was part thereof.

There was no physician-patient privilege at common law. *Hague v. Williams,* 37 *N. J.* 328 (1962); 8 *Wigmore, Evidence* (McNaughton rev. 1961), § 2380. The basic philosophy as to privilege in general is set forth in § 2192 of *Wigmore* as follows:

For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.

*Evid. R.* 7(d) manifests this general principle by providing that, except as provided for in the rules or by the law of this State, "No person has a privilege to refuse to disclose any matter or produce any object or writing."

The principle of strict construction of privileges is set forth in *State v. Briley,* 53 *N. J.* 498 (1969), as follows:

Since rigid adherence to the letter of the privileges promotes the suppression of truth, they should be construed and applied in sensible accommodation to the aid of a just result. In view of the obvious policy of the law to enlarge the domain of competency of

witnesses and to adapt rules of evidence to the successful development of the truth, *competency should be regarded as the rule and incompetency as the exception.* [at 506; emphasis supplied]

It must be noted, however, that the said exception *apparently* denies the privilege to one who *primarily* and *initially* seeks medical attention in order to avoid apprehension or detection for his wrongdoing, but would grant it in a situation where the services were sought without an original evasive purpose and for diagnosis and treatment only, despite the existence of other evidence that the patient has committed a crime or tort. This conclusion is unwarranted in view of the fact that the privilege and exception are in derogation of the common law and must be construed in favor of granting the competency of the results of the blood test in this case. *State v. Briley, supra.* It is true that defendant herein did not originally seek the services of the physician to avoid detection or apprehension. On the other hand, there is clear evidence that he was intoxicated at the scene, that he was the operator of the vehicle, that there was extensive damage thereto with the absence of any skid marks, and that he admitted he was not aware of hitting a utility pole located on the wrong side of the road. All of the above facts were of open knowledge to the police at the scene, and as such no basis for the existence of the confidential situation envisioned in the enactment of the statute. Professor Wigmore, an admitted critic of the physician-patient privilege in general, holds that four fundamental conditions are essential to the establishment of any privilege. The fourth condition is herein particularly relevant:

(4) That the injury that would inure to the relation by the disclosure of the communication, must be *greater than the benefit* thereby gained for the correct disposal of the litigation. [8 *Wigmore, op. cit.,* § 2285 at 527, emphasis by the author]

It is clearly inferential from the evidence herein that the police brought defendant to the hospital not only for treat-

ment but basically to determine the existence of illegal conduct. It can scarcely be urged that the physician-patient relationship established under these circumstances should warrant the exercise of a privilege on the ground that the privilege was of greater import than the benefit to the public of a full disclosure. It would indeed constitute a travesty of justice to deny the privilege to a wrongdoer where there is independent evidence thereof, and seeks medical aid to avoid detection, but grant the privilege because the treatment was originally sought for diagnostic purposes only, despite the independent evidence of wrongdoing. It is obviously inferential that the assertion of the privilege in the latter instance is likewise for the purpose of avoiding detection.

It must be noted, however, that the exception refers to the commission of a *crime*. Since *N. J. S. A.* 2A:4–44 b, *supra* defines as "delinquency" an act which would constitute a crime if committed by an adult, it may be contended that an act of delinquency is not within the purview of the exception. However, *R.* 5:8–1 requires that if

* * * delinquency is charged *the laws so violated shall be specified in the complaint;* but error in so specifying is not ground for dismissal of the complaint if the juvenile has not been misled to his prejudice. [Emphasis supplied]

The basic thrust of the Juvenile Act, as set forth in *N. J. S. A.* 2A:4–42(b), is

Consistent with the protection of the public interest, to remove from children committing delinquent acts, certain statutory consequences of criminal behavior and to substitute therefor an adequate program of supervision, care and rehabilitation.

█ It is clear that while the Juvenile Court process emphasizes the removal of criminal stigma and enjoins rehabilitation, it does not eliminate the substantive elements of the adult offense charged. The burden is on the state to prove the charge by competent evidence. *State in Interest of D. C.,* 114 *N. J. Super.* 499 (App. Div. 1971); the find-

ing must be established beyond a reasonable doubt *R. 5: 9–1* (d). A juvenile is now entitled to every defense available to an adult. *N. J. S. A.* 2A:4–60. It is concluded, therefore, that the use of the word "crime" in the said exception includes an act of delinquency which is based on the commission of an adult offense of criminal magnitude. The applicability of the exception to minors is reinforced by the alternative exception wherein a physician is utilized to enable a defendant to escape detection after the commission of a tort. Juveniles are, of course, responsible for tortious conduct.

The plain thrust of the statute is obviously to deny the privilege where there is evidence that it is used in furtherance of a criminal or tortious act. The obvious purpose of the privilege is to protect and encourage confidentiality between physician and patient and to facilitate the treatment of individuals innocent of any wrongdoing.

Assuming the existence of a purely diagnostic examination, to permit the privilege to be utilized where there is evidence of the commission of an unlawful act would permit the use thereof as a sword instead of as a shield, and countenance the subversion of the due administration of justice.

Where the operator of a motor vehicle is brought by the police to a hospital for the taking of a blood alcohol level sample (the hospital having previously agreed to provide same) and there is other evidence that operation of said vehicle was affected by the excessive use of alcohol or other dangerous drug, the fact that the sample was not taken because of an excusable delay in requesting same or a misunderstanding between the police and the hospital authorities as to the right of the police to secure said sample shall not disentitle the police to the results of a blood level sample then taken. This conclusion is reached even though the sample taken was for purely diagnostic and treatment purposes only. An interpretation of the exception which would permit the use of the privilege under these circumstances

would plainly distort the intendment of the statute as an entity and defeat its purpose. cf. *State v. Gratale Bros., Inc.,* 26 *N. J. Super.* 581 (App. Div. 1953).

The State's application for the release of the results of the blood sample taken of the defendant is hereby granted.