The STATE of Ohio, Appellee,

v.

GRALEY, Appellant.

[Cite as *State v. Graley*, 151 Ohio App.3d 647, 2003-Ohio-678.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19366.

Decided Feb. 14, 2003.

Carley J. Ingram, Montgomery County Assistant Prosecuting Attorney, for appellee.

Arvin S. Miller, Montgomery County Assistant Public Defender, for appellant.

WOLFF, Judge.

{¶ 1} Robert Graley was indicted for possession of crack cocaine and tampering with evidence. After the trial court overruled his motion to suppress, Graley pleaded no contest to the tampering count and was found guilty. The state withdrew the possession count. The trial court sentenced Graley to five years of community control sanctions.

{¶ 2} On appeal, Graley advances an assignment of error and issue for review as follows:

{¶ 3} "The trial court erred by overruling defendant's motion to suppress the evidence recovered from the illegal seizure and search of his person.

{¶ 4} "Issue Presented:

{¶ 5} "Did the police violate Mr. Graley's Fourth Amendment rights to be free from unreasonable search and seizure when they forcefully made him remove what was in his mouth after being stopped for a traffic violation?"

{¶ 6} The question presented in this appeal is whether Dayton Police Officer David House had probable cause to seize and search Graley for crack cocaine by forcing Graley to spit out what Officer House believed was crack cocaine in Graley's mouth.

{¶ 7} Graley concedes that Officer House may have had information sufficient to justify an investigative detention but contends that this information did not rise to the level of probable cause to search him.

{¶ 8} The evidence at the suppression hearing was as follows.

{¶ 9} On September 5, 2001, Dayton police officers were conducting surveillance at Mount Crest Courts, a Dayton Metropolitan Housing Authority property. Mount Crest Courts is a "high drug," "high crime" area about which the police

have received complaints of "open air drug sales occurring in the parking lots" and "drugs * * * being used and sold * * * throughout the apartment complex."

{¶ 10}   Around 8:00 p.m., Officer Kevin Phillips observed a 1986 grey Mercury Cougar pull into a parking lot.  The driver, who was the sole occupant of the car, was Graley.  Graley made contact with another man in front of 608 Mount Crest. The two walked around the building to a courtyard.  After about two minutes, Graley returned to his car and drove away.

{¶ 11}   Earlier that evening, Officer Phillips had observed a similar incident involving another person identified as Eric Crouse, who had driven into the parking lot, and the same man who had been standing in front of 608 Mount Crest and who had accompanied Graley around the building.  Officer Phillips believed that what he had observed on both occasions were drug transactions.

{¶ 12}   Officer David House had followed Crouse as he left the parking lot and had arrested him in front of his residence for possession of crack cocaine.

{¶ 13}   As he was returning to Mount Crest Apartments after concluding his activities with Crouse, Officer Phillips radioed information about a grey vehicle leaving Mount Crest Apartments.  Based on radioed information from Officer Phillips and from Detective Larrimore, who was following Graley's car, Officer House was able to get behind Graley's car as it went south on Smithville Road. Graley made an unsignaled left turn off Smithville onto East Second Street, for which Officer House eventually issued a citation to Graley, and Officer House made a traffic stop.  According to Officer House, what then occurred is as follows:

{¶ 14}   "Q. Okay. Once the car stopped, what did you do?

{¶ 15}   "A. I immediately stopped my cruiser behind it, exited and started to approach Mr. Graley's window.

{¶ 16}   "Q. So did you approach the passenger or the driver side?

{¶ 17}   "A. The driver side.

{¶ 18}   "Q. Okay. Did you observe anything while you were approaching the driver side window?

{¶ 19}   "A. Yes. As I got alongside of his windows, I could see Mr. Graley bring his right hand up and place something in his mouth.

{¶ 20}   "Q. Okay.

{¶ 21}   "A. However, I could not see the object or see anything in his hand at that time.

{¶ 22}   "Q. All right.  What did you do next?

{¶ 23} "A. Uh. Mr. Graley's window was down and immediately as I stepped alongside Mr. Graley's window, I also observed Mr. Graley move his tongue into his left cheek.

{¶ 24} "Q. Okay. After you observed that behavior, what'd you do next?

{¶ 25} "A. Uh. I very frankly—I asked Mr. Graley—the first thing I said to him was: 'Sir, was that, in fact, a piece of crack cocaine that you just stuck in your mouth?'

{¶ 26} "Q. And did he make any responses?

{¶ 27} "A. Uh. Mr. Graley mumbled keeping his mouth and lips pursed together: 'No.'

{¶ 28} "Q. Okay. What happened next?

{¶ 29} "A. At that point in time, based on the previous arrest and the encounter of Mr. Crouse, uh, the surveillance of Officer Phillips, uh, and my experience knowing that crack cocaine is very oftenly [sic] hidden and destroyed by the mouth, uh, when contacted by police, uh—

{¶ 30} "Q. Let me ask you this: You said in your experience—in your ten years as a police officer, about how many times have you observed someone put crack in their mouth and try to destroy it?

{¶ 31} "A. A few hundred easily.

{¶ 32} "Q. Okay. And the actions of the Defendant, were those similar to those hundred times that you observed people trying to destroy the crack cocaine?

{¶ 33} "A. Yes, it was.

{¶ 34} "Q. Okay. All right. So you at this point think he's either chewing it or doing something to it in his mouth. What do you do next?

{¶ 35} "A. At that point in time, I—I believed that he was simply concealing it.

{¶ 36} "Q. Okay.

{¶ 37} "A. And so I asked Mr. Graley to step out of the vehicle, which he complied.

{¶ 38} "Q. And once he was outside the vehicle, what happened?

{¶ 39} "A. As he stepped out of the vehicle, I placed my hand underneath his chin and I asked Mr. Graley to open his mouth.

{¶ 40} "Q. The—

{¶ 41} "A. The reason I placed my hand underneath his chin was in fact, quite often when you ask individuals that and they realize that basically it's discovered,

the first reaction is to swallow or to start chewing the item. And I placed my hand close by in case he did attempt to start chewing that I could try to prevent that.

{¶ 42} "Mr. Graley, in fact, though, when I asked him to open his mouth, he did, in fact, open his mouth. However, he tilted his head backwards to where I still could not see into his mouth. At this point in time, I asked him to lower his chin so that I could see into his mouth. And then after this second request, Mr. Graley did, in fact, start manipulating the object in his cheek and start to chew.

{¶ 43} "Q. Okay. Once you observed that behavior, what did you do?

{¶ 44} "A. My left hand was still underneath of his chin. I reached up with my right hand behind his head and I ordered him to the ground, saying: 'Get on the ground, get on the ground.' And I took him to the ground. At that point in time, using my thumb and fingers of my left hand, I pinched his cheeks and jaw together underneath his teeth so that he couldn't chew.

{¶ 45} "And I—laying on the pavement at this time, I continually ordered him to start spitting—to spit whatever he had in his mouth onto the ground.

{¶ 46} "Q. Did he comply with that order?

{¶ 47} "A. After about, I would say five to ten seconds, he did, in fact, spit.

{¶ 48} "* * *

{¶ 49} "* * *. At that time I observed a piece of white chunky material come out of his mouth and land on the payment [sic], I would say a distance of probably maybe eight inches from his mouth.

{¶ 50} "Q. Okay. And to be clear, that substance was not there prior?

{¶ 51} "A. No, it was not.

{¶ 52} "Q. Okay. And could you—you described it as a white chunky material. In your experience as a police officer, what did you believe that to be?

{¶ 53} "A. Crack cocaine."

{¶ 54} Thereafter, Officer House retrieved fragments of what Graley had spit out from the sidewalk and Graley's left hand. These fragments were found to be crack cocaine. During the takedown, Graley sustained an abrasion on his right cheekbone.

{¶ 55} In our judgment, the traffic stop was legitimate, and exigent circumstances existed for a warrantless search, and these issues are not open to question. Officer House observed a traffic violation, and Graley attempting to dispose of what Officer House believed to be crack cocaine.

{¶ 56}   The central issue in this appeal is whether Officer House entertained "a reasonable ground for belief" that Graley possessed crack cocaine when he ordered Graley to open his mouth.  *State v. Moore* (2000), 90 Ohio St.3d 47, 49, 734 N.E.2d 804.  We conclude that he did.

{¶ 57}   He and Officer Phillips had been conducting surveillance in a high-drug activity area.  He had just arrested Eric Crouse for possession of crack cocaine after Crouse had been involved in a brief encounter with the man in front of 608 Mount Crest.  As he was returning to the Mount Crest Apartments, he was alerted by Officer Phillips to the 1986 grey Mercury Cougar, whose sole occupant had just been observed by Officer Phillips—who had also observed the Crouse encounter—engaged in a brief encounter with the same man in front of 608 Mount Crest that Crouse had encountered.

{¶ 58}   Upon approaching Graley, Officer House observed Graley put something in his mouth, which he knew from experience was a place where drugs are "hidden and destroyed."

{¶ 59}   Finally, we find no constitutional infirmity in the manner in which the police compelled Graley to expel the crack cocaine from his mouth.  See *State v. Fisher* (Feb. 13, 1996), Allen App. 1–93–71, 1996 WL 65487, citing *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.

{¶ 60}   The assignment of error is overruled.

{¶ 61}   The judgment will be affirmed.

Judgment affirmed.

FAIN, P.J., and GRADY, J., concur.