18685

The State, Respondent, v. Willie James BELL, Appellant
(156 S. E. (2d) 313)

*Messrs. Thomas A. Babb,* of Laurens, *Cecil E. White,* of Clinton, *W. H. Nicholson, Jr.,* of Greenwood, and *Matthew J. Perry,* of Columbia, *for Appellant,*

*William T. Jones, Esq., Solicitor,* of Greenwood, *for Respondent.*

August 1, 1967.

BRAILSFORD, Justice.

The wife of a prominent Laurens County attorney was murdered in the town of Clinton, South Carolina, on August 23, 1963. The mutilated and ravished body of Mrs. Justin Bridges was left by her assailant on the floor of her husband's auxiliary law office. There were no eyewitnesses. At the April, 1965, term of the Court of General Sessions for Greenwood County, the appellant, Willie James Bell, a Negro, was tried for murder, convicted and sentenced to death by electrocution. He was ably represented at his trial by four court-appointed attorneys, who now prosecute this appeal in his behalf.

The defendant was indicted at the February, 1965, term of the Court of General Sessions for Laurens County. Thomas A. Babb and Cecil E. White, Esquires, of the Laurens County Bar, and Matthew J. Perry, Esquire, of the Richland County Bar, were appointed to represent him. The venue of the case was transferred from Laurens County to Greenwood County. Thereupon, W. H. Nicholson, Jr., Esquire, of the Greenwood County Bar was added to defense counsel by appointment.

Upon the call of the case for trial at the April, 1965, term of the court, the defense moved for a continuance.[1] The first ground of appeal charges error in the court's refusal of this motion. It is axiomatic that such a motion is addressed to the sound discretion of the trial judge. His ruling thereon will rarely be disturbed on appeal. However, under the peculiar facts of this unusual case a serious question is presented as to whether the refusal of

---

[1] Inferentially, only two weeks had elapsed since the change of venue had been granted and Mr. Nicholson appointed.

a continuance involved error of law affecting the substantial rights of the defendant. In *favorem vitae,* we feel constrained to resolve this question in appellant's favor and grant him a new trial.

On the day after Mrs. Bridges' death, three warrants for the defendant's arrest were issued in the town of Clinton on complaints which were not related to the murder. He was picked up in Greenville on September 5, 1963. After routine interrogation at State Law Enforcement Division Headquarters about his August 23rd activities in the town of Clinton, he was returned there to answer the charges against him. On September 7th, he pled guilty in recorder's court to two of the warrants and was sentenced to serve sixty days in the town jail.

Later in September he was indicted in General Sessions Court for Laurens County on the charge contained in the third warrant. An attorney was appointed for him as an indigent defendant, and the case was continued beyond the term. At the November term, he signed a plea of guilty. However, when the defendant was called up for sentencing, the court declined to accept the plea and committed him to the South Carolina State Hospital for examination as to his sanity. Having been returned to custody after such examination, he was tried at the February, 1964, term of the court, convicted, and sentenced to a term in the South Carolina Penitentiary.

The defendant was continuously in custody from September 5, 1963, to the date of his trial.

Although, according to the testimony of the State's witnesses, the defendant on September 10, 1963, confessed to the murder of Mrs. Bridges, and made other incriminating statements on that day and on September 17, 1963, it was not until February, 1965, that he was charged with murder and provided with counsel. In the meantime the State had been gathering evidence against him and subjecting him to extensive psychiatric examination.

In support of the motion for a continuance, appointed counsel relied upon their own affidavits that since their appointment the defendant had shown no comprehension of his plight, and, despite their efforts to win his cooperation, either could not, or would not, assist them in the preparation of a defense or communicate with them in any meaningful way.

The defense also offered the oral testimony of Dr. Z. L. Agardy, a qualified psychiatrist and director of a mental health clinic at Greenwood. Dr. Agardy had interviewed the defendant only twice, once in private and once through the bars of a cell with other persons present. The doctor testified that he detected "some symptoms suggesting mental illness." However, he stated that his examination had not been thorough enough for him to form an opinion "about his sanity, or his insanity, possible mental illness, or no illness. *I would need further time, further examination.* This is an important case. He is not an easy patient to examine and I don't feel that my examination was satisfactory. * * * I wouldn't say that he is sane, and I am not in a position to say that he is insane either."

At the conclusion of Dr. Agardy's testimony, the solicitor stated that the State had experts present who had examined the defendant at great length. However, he virtually conceded the necessity for a continuance. "I must candidly say it looks to me like in the face of the position that Dr. Agardy is placed I don't see any need of going forward with giving to His Honor what we have, unless His Honor would indicate he would desire to hear from the State's doctors, who are present at this time." The trial judge, nevertheless, concluded that he should hear the testimony of the State's experts, stating: "If they are prepared to state he is sane, ready to go to trial, I would feel more assured about my ruling * * * than if I didn't hear from the doctors."

Thereupon, Dr. Edward M. Burn, referred to in the record as Chief Psychiatrist of the South Carolina State Hospital, was examined as a witness. He testified that he first

saw the defendant in November, 1963, and that since that time he had talked with him for "at least a hundred hours or more." [2] The witness expressed the opinion that the defendant was not affected by mental illness. He found no evidence of such illness either in the barbarous and inhuman nature of the offense with which the defendant was charged or in his extreme deviations from normal conduct and speech while in custody. He related these things to the defendant's cultural level and was confidently of the opinion that they were not symptomatic of mental illness. However, Dr. Burn readily acknowledged that many members of his profession would disagree with his conclusion and would regard these circumstances as strong evidence of mental illness.

■ Assuming the admissibility of various incriminating statements which had been made by the defendant to law officers and others while in custody, the only practical defense open to him was that of insanity. He had been held in custody for more than a year, without benefit of counsel, while being subjected to extensive psychiatric examinations by the State's experts. Before being put to his trial, he was entitled to a fair opportunity to present on this vital issue the testimony of an expert of his own choice or one chosen for him by his counsel. Except as already recited, the record does not reveal why Dr. Agardy was unable to complete his examination and evaluation of the defendant prior to the trial. There is no contention that counsel for this indigent defendant failed to exercise due diligence in this respect after their appointment. Inferentially, the doctor's services were not available until the defendant was transferred to Greenwood for trial. The testimony of both psychiatrists suggests that if the motion for continuance had been granted, the defendant may have been able to present qualified expert opinion opposing that of Dr. Burn. Even if testimony tending to establish insanity *as a defense* could not have been developed, expert opinion evidence that the

---

[2] Later, in his testimony before the jury, the witness estimated that altogether he had spent *"several hundred hours"* with the defendant, remarking that some sessions with him had lasted as long as *eight hours*.

defendant was affected by mental illness might well have been produced. Such testimony may have influenced the jury in the exercise of its discretion to recommend mercy and spare the defendant's life. Under these circumstances, we think that the trial judge erred in putting the defendant to his trial without, at least, affording an opportunity for a meaningful examination and evaluation of his mental condition by an admittedly qualified psychiatrist whose assistance had been enlisted by counsel and who stood ready to perform this professional service. Compare *State v. Livingston,* 233 S. C. 400, 105 S. E. (2d) 73, and *Timmons v. Peyton,* 360 F. (2d) 327 (4th Cir.)

There is another error apparent on the record which ■ necessitates a new trial. During the direct examination of Chief Strom of the South Carolina Law Enforcement Division, his attention was called to, January 22, 1965, and he was asked whether the defendant made any statement to him on that date. The witness responded, over the objection of defense counsel, that on January 22, 1965, as he, Lt. Wyndham and the defendant left Clinton by automobile, and after the defendant had been advised of his rights, quoting, "He freely and voluntarily stated to me that he had to kill another young white woman; he wanted to bathe his feet and his head in her blood."

This highly inflammatory testimony could only bear upon the defendant's state of mind on January 22, 1965, which was not in issue. It had no logical relevancy to the murder of August 23, 1963. The testimony should have been excluded as irrelevant. Its admission requires reversal because substantial prejudice to the right of the defendant to, a fair trial may have resulted.

We now turn to, the remaining issues raised by the exceptions which are likely to recur upon a retrial.

Witnesses for the State were permitted to describe ■ the mutilated condition of the victim's body (multiple stab wounds and lacerations over the abdomen

and chest, the forehead macerated, the skull crushed, the brain exposed). According to the testimony, the body was lying on its back. The dress was around the thighs. The undergarments were torn through the crotch. A pubic hair of negroid origin was found in this area. A vaginal smear was taken and a live sperm identified and photographed. Counsel urge that the foregoing evidence was not necessary to sustain the charge of murder, tended to prove the commission of rape, and was inflammatory and highly prejudicial.

We find no error as assigned. The testimony describing the condition of the victim's body and that tending to establish that there had been a sexual connection with it, were admissible on the issues of malice and motive. The exceptions which challenge this testimony are without merit under principles stated in *State v. Thomas,* 248 S. C. 573, 151 S. E. (2d) 855, 860, and authorities cited therein.

In addition to the pubic hair already mentioned, several head hairs of negroid origin were removed from the victim's clothing. Testimony was allowed as to a microscopic examination and comparison of these hairs with specimens of the defendant's head and pubic hair. Counsel objected to the use of these specimens as a violation of the defendant's constitutional right against self-incrimination, and assign as error their admission in evidence. We see no element of testimonial compulsion in the admission of these exhibits, hence, no violation of the constitutional right invoked. *State v. Griffin,* 129 S. C. 200, 124 S. E. 81, 35 A. L. R. 1227.

The testimony indicates that the hair specimens were voluntarily provided by the defendant, which in itself resolves the issue against him. We point out, however, that there is strong authority sanctioning the strictly analogous use of specimens of a defendant's blood or urine as evidence, whether or not he voluntarily cooperated in providing them. See *Schmerber v. State of California,* 384 U. S. 757, 86 S. Ct. 1826, 16 L. Ed. (2d) 908; 8 Wigmore, Evidence, Sec-

tion 2265, at 387 & 391 (McNaughton Rev. 1961) ; 21 Am. Jur. (2d), Criminal Law, Section 364.

Seven exceptions charge that the court erred in allowing the testimony of five law enforcement officers and two other witnesses as to incriminating statements or admissions made to them or in their presence by the defendant while in custody.

The trial of this case took place before the decision in *Miranda v. State of Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. (2d) 694, 10 A. L. R. (3d) 974. In this decision the Supreme Court laid down new procedural "safeguards" which must be employed before any statement, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant, may be received in evidence, without violating the defendant's constitutional right against self-incrimination. In *Johnson v. State of New Jersey,* 384 U. S. 719, 86 S. Ct. 1772, 16 L. Ed. (2d) 882, the Court refused to apply the new constitutional standards retroactively. *"Miranda* applies only to cases in which the trial began after the date of our decision one week ago."

We have carefully examined the testimony referred to in these exceptions, which is identified in each only by the name of the witness and the date of the alleged statement by the defendant, and we find no error as assigned. Most of defendant's contrary argument is founded upon the inapplicable requirements of *Miranda.*

The testimony of Lt. Blakely, Lt. Fortson, and Sheriff Johnson related to spontaneous, voluntary utterances of the defendant. Although the defendant was in custody, the statements were not the product of interrogation and were not intentionally elicited by any other means.

The testimony of Chief Strom and of Lt. Wyndham [3] relates to a confession or incriminating admission made to

---

[3] The tenth exception refers to the testimony of Lt. Wilson. We find none by him of this tenor, and assume that Lt. Wyndham was intended.

Chief Strom by the defendant on September 10, 1963, which was the product of custodial interrogation. However, measured by pre-*Miranda* standards, the defendant was adequately warned of his rights, and the statement was freely and voluntarily made.

There was no error as assigned in the admission of the testimony of the five officers referred to in these exceptions.

Jobie Shelton, a former acquaintance of the defendant, was an inmate in the penitentiary when the defendant began serving his 1964 sentence. The two men became companions, and the defendant mentioned the *Bridges' case* several times to Jobie, indicating that he was implicated. Jobie got word to the investigating officers that he could be helpful to them. At their request, in June, 1964, Jobie and the defendant were placed in the same cell, and remained cell mates until the defendant was charged with the murder. They frequently talked about the murder, and Jobie prodded for details. From time to time he advised the officers what the defendant had said. Jobie was called as a witness by the State and gave damaging testimony as to the defendant's statements to him. There was no error in the admission of this testimony. The defendant had free choice to talk to Jobie or to remain silent. There was nothing coercive in his relations with his cell mate. His statements were voluntary, and their admission in evidence did not violate any of his constitutional rights.

The last of the witnesses referred to in these exceptions is the defendant's uncle, Sherman Bell. Sheriff Johnson took Sherman to the penitentiary to visit the defendant. According to Sherman's testimony, which was admitted over objection, the defendant privately admitted to him that he had killed Mrs. Bridges. For the reasons assigned in overruling the exception to the admission of Jobie's testimony, we find no error.

The remaining question argued in the brief relates to a non-recurring matter which need not be considered. How-

ever, we are moved to express grave doubt as to the competency of certain testimony relating to the 1965 custodial confrontation of the defendant by the witnesses Jobie Shelton and Sherman Bell in the presence of several law enforcement officers. The inference is unmistakable that the confrontations were for the purpose of eliciting a statement from the defendant or otherwise developing evidence against him. This court disapproved of the admission of such testimony under similar circumstances in *State v. Hester,* 137 S. C. 145, 134 S. E. 885. At any rate, *Miranda* proscribes the use of evidence that the defendant while in custody stood silent in the face of accusation. See *Miranda v. State of Arizona, supra,* 384 U. S. at 468, 86 S. Ct. at 1625, 16 L. Ed. (2d) at 720, n. 37.

Reversed and remanded for a new trial.

Moss, C. J., and LEWIS, BUSSEY and LITTLEJOHN, JJ., concur.

