OPINION OF THE COURT
Lee H. Elkins, J.
A petition filed on October 12, 2001 alleges that the respondent mother neglected her seven-year-old child, Tyler, by failing to provide the child with appropriate medical attention to treat her ADHD, by refusing to accept board of education referrals for a special education program for Tyler, and by failing to provide Tyler with adequate shelter because of her failure to pay rent, electricity and gas bills, and by using marijuana and not enrolling in a drug treatment program. The petition also alleges that the respondent mother has been diagnosed as suffering from mental illness, “specifically as paranoid and delusional, and with a possible personality disorder.” On the basis of this last allegation, the petitioner seeks an order of this court pursuant to Family Court Act §§ 251, 1038 (d) to have the respondent evaluated to determine whether she in fact suffers from an untreated mental illness which impairs her ability to care for the child.
Factual Basis
In support of its motion, the petitioner files five exhibits. Essentially, the exhibits show that the respondent had been in treatment with a certified social worker at Brookdale Medical Center from September 22, 2000 until February 2001. She had been seen about five times before treatment was discontinued in February due to the respondent’s noncompliance. The therapist’s recommendations in the discharge summary were day treatment, medication management and parenting skills classes. The respondent had been prescribed an antidepressant, Paxil, and ah antianxiety medication Xanax, on November 22, 2000. The respondent’s principle complaint was anxiety attacks. The respondent told the evaluators that she felt like she would “burst” when she got angry and that she slept only a few hours a night. Her diagnosis was panic disorder and agoraphobia. The respondent was not seen by her therapist at the clinic after November 13, 2000, until she contacted the clinic in May 2001, due to problems she was having with the board of education. She was seen twice before again being lost to contact.
The respondent became known to the Administration for Children’s Services (ACS) in August 2001, when she reported *730 that she believed Tyler had been sexually abused by a friend of Tyler’s father, some eight months before. According to records of the Brookdale Medical Center, the respondent provided an incoherent narrative to her former therapist, the certified social worker, about Tyler touching her mother’s breasts and telling her mother that her father’s friend did the same thing to Tyler. Apparently, the respondent also indicated that the father’s friend inserted his finger into Tyler’s vagina and also appeared to assert that the friend’s daughter had raped Tyler. The respondent then reported that Tyler’s father was in jail. She connected this with having seen a police car leaving the vicinity of her residence. She talked about leaving Tyler alone while she reviewed a court transcript that someone had “planted” where she could find it. The respondent then spoke about cults and about the police being against her. When the therapist suggested reopening the mother’s counseling, the respondent refused. The therapist suggested that the respondent might want to go to the emergency room to speak to a psychiatrist, and again the respondent refused. The therapist described the respondent as paranoid.
The respondent also called the police about the alleged sex abuse. Tyler was examined at a pediatric emergency room on August 21, 2001 and no physical evidence of sexual abuse was found. After an investigation, ACS determined that the sexual abuse could not be substantiated.
ACS requested an evaluation of the respondent by the mobile crisis team (MCT) at Interfaith Hospital. According to documents of the mobile crisis team, numerous attempts to see the respondent were unsuccessful from September 2 to November 25, 2001 with the exception of a visit to her home by a psychologist on September 4, 2001. MCT records indicate that the September 4 evaluation was incomplete due to the presence of Tyler who was extremely hyperactive. The evaluator found no apparent delusions or thought disorder. Thé respondent was not found to be a danger to herself or others. Her sole contingent diagnosis was personality disorder. The respondent told the evaluator that she was in treatment at Brookdale. When MCT determined that she was not in treatment, they attempted unsuccessfully to conduct a further evaluation. The evaluator’s conclusion in a letter to ACS was that the initial diagnosis was likely incorrect. Based upon conversations with the respondent’s therapist, the evaluator indicated that it was “more likely that she is paranoid and delusional.”
In November 2001 ACS learned that the child Tyler had been placed into foster care by Connecticut Department of Chil *731 dren and Family Services (DCFS). On November 15, 2001 the respondent was found with Tyler at the Norwalk, Connecticut, emergency shelter, apparently hallucinating, slapping at herself and reprimanding Tyler to “stop you’re making it crawl on me.” The respondent told the shelter staff that she lost her job and apartment and had no money. The staff noted that Tyler was running all around the shelter and was beyond her mother’s control. The respondent was evaluated by a crisis center psychiatric nurse, and found to suffer from posttraumatic stress disorder, severe depression and Myasthenia Gravis. The nurse recommended that she be evaluated at a hospital. Based upon Tyler’s behavior and the respondent’s statement to shelter workers in Connecticut that Tyler had been vaginally penetrated by a friend of her father’s, Tyler was taken by ambulance to a Norwalk hospital for examination. A doctor at the Norwalk hospital diagnosed Tyler as suffering from severe ADHD and recommended to the respondent that the child be medicated. The respondent refused. Connecticut child protective documents show that the hospital staff observed the respondent pull a remote control wire out of the wall and attempt to hit Tyler with it. The Connecticut DCFS records state that the caseworkers believed respondent unable to manage Tyler’s behavior due to respondent’s own emotional problems. Connecticut DCFS referred respondent for a psychiatric evaluation on November 16, 2001. According to ACS records, the Connecticut DCFS informed ACS that the respondent left before the evaluation could be conducted. The respondent returned to Brooklyn, leaving Tyler in foster care.[1]
On November 20, 2001, acting on a warrant issued by this court after the respondent had disappeared from her residence with Tyler, the police and ACS child protective worker went to the respondent’s Brooklyn residence. A neighbor informed the officers that the respondent mother recently knocked on his door at 2 o’clock in the morning to inform him that she “had been playing hide and seek with her cat and placed the cat in the freezer.” The neighbor told the police that he entered the respondent’s apartment and removed the frozen, dead cat from the freezer and placed the carcass in the garbage.
Legal Analysis
Family Court Act § 1038 (d) applies Civil Practice Law and Rules article 31 to child protective proceedings “unless *732 otherwise proscribed” by Family Court Act article 10. Under CPLR 3121 (a), a party to a civil action whose mental condition is sufficiently in controversy may be compelled to submit to a forensic mental health examination upon motion of a party opponent. (See, e.g., Matter of R./G. Children, 165 Misc 2d 518 [Fam Ct, Kings County 1994].) A verified petition alleging neglect on grounds of mental illness sufficiently places the respondent’s mental state in controversy, to authorize a prefact-finding examination pursuant to CPLR 3121 (a). (See, Matter of M. Children, 171 Misc 2d 838 [Fam Ct, Kings County 1997].) The standard applicable under CPLR 3121 (a) is whether such an evaluation is “material and necessary” to the petitioner’s case. (See, e.g., Matter of R./G. Children, supra.)
The petitioner shows that the evaluation is material to petitioner’s case by exhibiting an objective basis for believing that the respondent may suffer from a mental illness. The petitioner shows that the respondent repeatedly presented to mental health professionals as suffering from paranoia and delusions. In August 2001, her therapist found respondent to be paranoid and agoraphobic, and recommended that she be evaluated by a psychiatrist in the Brookdale hospital emergency room. The Interfaith Mobile Crisis Unit, in a letter to ACS, based upon an evaluation of September 4, 2001 and upon conversations with the respondent’s therapist, indicated that it was “likely that she is paranoid and delusional.” On November 15, 2001 the staff at the Norwalk, Connecticut, emergency shelter observed respondent apparently hallucinating, slapping at herself and reprimanding Tyler to “stop you’re making it crawl on me.” The crisis center psychiatric nurse evaluating the respondent found her to suffer from posttraumatic stress disorder, severe depression and Myasthenia Gravis. The nurse also recommended a hospital evaluation. On November 20, 2001 a neighbor reported to the police that the respondent had frozen her pet cat to death under circumstances which indicate thatethe respondent may have been delusional.
Moreover, based upon observations of the respondent’s interaction with Tyler, there is reason to believe that her ability to provide Tyler with adequate supervision and guardianship may be impaired. In addition to the possibly false allegation of sexual abuse, the respondent was heard to tell Tyler to stop making some apparently imaginary thing “crawl on” her. She was seen to attempt to strike Tyler with a cord, and was found by the Connecticut child protective authorities to be unable to manage Tyler’s behavior in light of the respondent’s own apparent emotional problems.
*733 The petitioner also shows a need for a forensic evaluation, by the absence of an alternate source of information about the respondent’s mental health. In light of the respondent’s repeated refusals to comply with recommendations to submit voluntarily to a meaningful evaluation of her mental state, no other source of such information is available to the petitioner. The respondent’s therapist, a certified social worker, diagnosed the respondent as suffering from depression and agoraphobia, and recommended a hospital psychiatric evaluation. The mobile crisis team psychologist diagnosed the respondent as suffering from personality disorder, and attempted to conduct a further evaluation, with which the respondent failed to cooperate. The psychiatric nurse at the Connecticut crisis center diagnosed the respondent as having posttraumatic stress disorder, severe depression and Myasthenia Gravis, and recommended a hospital psychiatric evaluation. These differential diagnoses were obtained under circumstances of questionable reliability. The therapist saw the respondent five times. The mobile crisis team saw her once under conditions which led the evaluator to deem the evaluation incomplete. The psychiatric nurse saw the respondent briefly in a homeless shelter. Consequently, there is no reliable, competent opinion regarding the respondent’s mental state as it affects her ability to care for Tyler.
Consequently, the petitioner shows that the evaluation is material to preparation of petitioner’s case, and is necessary as unobtainable from another source.
To the extent that Matter of Verena E. (163 Misc 2d 464 [Fam Ct, Kings County 1994]) and Matter of Sebastian M.[2] (NYLJ, Jan. 9, 1997, at 29, col 6 [Fam Ct, Kings County]) are inconsistent with this result, the court declines to follow them. The court in Verena E. (at 466), and Sebastian M., relied upon Family Court Act § 1047 (b), upon language of Family Court Act § 1038-a, and upon the absence within article 10 of "a stat *734 ute authorizing the court to order pretrial psychiatric, psychological or psychosocial examinations or reports,” to hold that there is no authority under Family Court Act article 10 to compel a respondent to submit to a prefact-finding psychological evaluation. The court cited Family Court Act § 1047 (b) as limiting the Family Court’s authority to order prefact-finding evaluations. The court read Family Court Act § 1038-a as enlarging, rather than as limiting, discovery in child protective cases.
The court held that these provisions were intended to limit the otherwise broad grant of authority to the Family Court under Family Court Act § 251 (a) to “order * * * the parent or other person legally responsible for the care of any child within its jurisdiction to be examined by a physician, psychiatrist or psychologist appointed or designated for that purpose by the court when such an examination will serve the purposes of this act * * * .” While acknowledging the accepted application of this section to permit forensic psychological evaluations of parties in custody matters (see, e.g., Do Vidio v Do Vidio, 56 Misc 2d 79 [Fam Ct, Monroe County 1968] [Family Court authorized to compel respondent in custody case to submit to psychological evaluation, applying CPLR article 31]), the court held that the statute could not be applied equally in child protective proceedings, because the state has initiated the proceeding and “[t]he respondent should not be compelled by the court to facilitate her own adjudication of neglect.” (Matter of Verena E., 163 Misc 2d at 467.)
The court in Verena E., and in Sebastian M., overlooks the use of the term “parent or person legally responsible for the care of any child within its jurisdiction” in Family Court Act § 251 (a) to designate persons who may be compelled to submit to a,psychological or psychiatric examination. The term “person legally responsible” is defined in Family Court Act § 1012 (g). A respondent in an article 10 proceeding includes “any parent or other person legally responsible for a child’s care who is alleged to have abused or neglected such child.” (Family Ct Act § 1012 [a].) It appears that the Legislature, by using in Family Court Act § 251 the terms used in article 10 to define who is a respondent, intended such respondent to be subject to compelled psychological or psychiatric examination “when such an examination will serve the purposes of this act * * * .” (Family Ct Act § 251 [a].)
*735 However, Family Court Act § 1047 (b) applies to reports prepared for dispositional purposes,[3] which “may not be furnished to the court prior to the completion of * * * fact-finding.” In this case, Family Court Act § 1047 (b) has no application, since the evaluation is intended to assist petitioner at fact-finding, and not at disposition.
Finally, this court finds that Family Court Act § 1038-a does constitute a proscription upon Family Court Act § 1038 (d), but not the limitation which the court in Verena E., and in Sebastian M. read into the section. Family Court Act § 1038-a states: “Upon motion of a petitioner or law guardian, the court may order a respondent to provide nontestimonial evidence, only if the court finds probable cause that the evidence is reasonably related to establishing the allegations in a petition filed pursuant to this article. Such order may include, but not be limited to, provision for the taking of samples of blood, urine, hair or other materials from the respondent’s body in a manner not involving unreasonable intrusion or risk of serious physical injury to the respondent.” (Emphasis added.) The court in Verena E. reasoned that because Family Court Act § 1038-a is limited to nontestimonial evidence, and a mental health evaluation constitutes testimonial evidence (see, e.g., Lee v County Ct, 27 NY2d 432 [1971]), the statute is intended to prevent the court from compelling a respondent to submit to such an examination, pretrial. This court does not find that the wording of the statute compels the conclusion reached in Verena E.
This construction proceeds from the premise that discovery is limited under Family Court Act article 10.[4] Family Court Act § 1038-a preceded the liberal discovery provisions of Family Court Act § 1038 (d), which made clear that general rules of civil discovery apply to article 10 proceedings, “unless otherwise proscribed by * * * article” 10. Thus Family Court *736 Act § 1038 (d) declared the authority of the Family Court to order discovery in article 10 cases to be coextensive with that possessed by courts in any other proceedings governed by CPLR article 31, except where specifically limited by Family Court Act article 10. Although Family Court Act § 1038-a proscribes discovery of nontestimonial evidence in article 10 cases, the statute is silent as to testimonial evidence. Consequently, testimonial evidence may be compelled, in a proceeding under article 10, to the same extent as in any other civil proceeding, unless Family Court Act § 1038-a may be read to imply a silent proscription.
In this court’s view, section 1038-a was enacted in 1987, in recognition that the judicially crafted exclusionary rule applicable to Fourth Amendment violations does not apply to evidence obtained by governmental authority in child protective proceedings. (See, e.g., Matter of Diane P., 110 AD2d 354, 356 [2d Dept 1985], appeal dismissed 67 NY2d 918 [1986] [“the State’s overwhelming interest in protecting and promoting the best interest and safety of minors in a child protection proceeding far outweighs the (exclusionary) rule’s deterrent value”].) The Legislature intended by enacting Family Court Act § 1038-a, to limit discovery, by protecting respondents in child protective proceedings from governmental intrusion upon the integrity of their person. The term “nontestimonial” evidence refers to physical evidence compelled from the person, which the Supreme Court has found is protected by the Fourth Amendment requirement of probable cause, but not by the Fifth Amendment privilege against self-incrimination. (Schmerber v California, 384 US 757, 763-764 [1966].) Family Court Act § 1038-a simply recognizes that when the government seeks to discover evidence by means which intrude upon a person’s bodily integrity, the government action implicates the Fourth Amendment prohibition against unreasonable searches and seizures, and should be justified by probable cause that the evidence is reasonably related to establishing the allegations in the petition. The Legislature imposed this higher burden on parties in an article 10 proceeding, only as to the discovery of “nontestimonial” evidence obtained from a respondent’s physical body. There is no indication in the language of the statute of any legislative intent to circumscribe discovery of testimonial evidence from a respondent in a child protective proceeding under article 10.
Despite the concern in Verena E. that “[t]he respondent should not be compelled by the court to facilitate her own *737 adjudication of neglect” (Matter of Verena E., 163 Misc 2d at 467), there is nothing in the legislative history of Family Court Act § 1047 (b) or other statutes cited by the court to indicate that the Legislature also intended to extend the protections afforded by the Fifth Amendment to respondents in proceedings under Family Court Act article 10. A child protective proceeding is not a criminal prosecution. (See, e.g., Matter of Diane P., supra, 110 AD2d 354.) Unlike a criminal defendant, a respondent in a child protective proceeding may suffer an adverse inference from his or her silence at trial. (See, Commissioner of Social Servs. v Phillip De G., 59 NY2d 137, 141 [1983].) As in any other civil proceeding, a respondent in an article 10 proceeding may be required to answer interrogatories. (See, e.g., Matter of David E., 176 Misc 2d 363 [Fam Ct, Orange County 1998].)
Reading Family Court Act § 1038-a consistently with Family Court Act § 1038 (d), there is no evidence of a legislative intent to extend greater protection to testimonial evidence obtained from a respondent in a child protective case than is afforded any other civil litigant whose mental condition is placed in issue by the pleadings. Rather, Family Court Act § 1038-a demonstrates that the Legislature chose to impose a higher burden of discovery in those instances where evidence is obtained from the person of the respondent, and in no others. Had the Legislature intended to impose stricter standards for the discovery of testimonial evidence, then the Legislature would have been equally specific.[5]
Consequently, the court holds that Family Court Act § 1038-a does not preclude this court from ordering that the respondent be examined by a psychiatrist for the purpose of evaluating the respondent’s mental condition. The court directs the respondent to appear at a time and place designated for the purpose of submitting to a mental status evaluation by a psychiatrist to be selected by the parties.

. Tyler was returned to this jurisdiction, pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act, after this court informed the Superior Court for Juvenile Matters at Norwalk, Connecticut, of this pending child protective proceeding.

. In Matter of Sebastian M. (NYLJ, Jan. 9, 1997, at 29, col 6 [Fam Ct, Kings County]), the applicability of CPLR 3121 in article 10 proceedings was not in issue, since the petitioner did not comply with notice provisions of the statute. The court wrote: “Were the Commissioner to attempt to use the results of this examination as proof of the allegations in the neglect petition against Dorothy M., admission of the Bellevue evaluation into evidence should be precluded under CPLR 3126(2) because the procedural aspects of the Rule were not followed, Matter of Kaitlyn S., 148 Misc.2d 276 (Fam. Ct. Rockland Co. 1990), and as a result, the Respondent had no opportunity to object to the examination under CPLR 3122 or to request a protective order under CPLR 3103.” (Matter of Sebastian M., at 30, col 1.)

. It appears that the report at issue in Sebastian M. was prepared for purposes of determining a suitable placement for the respondent, as a subject child in a neglect proceeding brought against her mother. Therefore, the provisions of Family Court Act § 1047 (b) were fully implicated.

. The court also stated in dicta in Sebastian M. (at 30, col 1), “Submission to a mental health examination requires a person to give testimonial evidence and, therefore, is not a type of evaluation which could be ordered under FCA § 1038-a. When FCA § 1038 (d) was enacted, the legislature did not remove the proscriptions on nontestimonial evidence from FCA § 1038-a, therefore, mental examinations of respondents under CPLR 3121, as well as depositions of respondents under CPLR 3106 and interrogatories under CPLR 3130, are not available as discovery devices through FCA § 1038 (d). The Commissioner may not avail himself of the discovery tools in CPLR 3121 to gain what he is denied under FCA § 1038-a.”

. “[A] court cannot by implication supply in a statute a provision which it is reasonable to suppose the Legislature intended intentionally to omit; and the failure of the Legislature to include a matter within the scope of an act may be construed as an indication that its exclusion was intended.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 74.)