GUIDRY, J.
|2The defendant, Marcus Weber, was charged by bill of information with one count of vehicular homicide (count 1), a violation of La. R.S. 14:32.1, and four counts of first degree vehicular negligent injuring (counts 2-6), violations of La. R.S. 14:39.2. The defendant pled not guilty to all counts. The defendant filed a motion to suppress the blood and toxicology test. Following a hearing on the matter, the motion to suppress was denied. In a writ application, the defendant sought review of the trial court’s ruling. In an unpublished action, the writ was denied. State v. Weber, 11-0125 (La.App. 1st Cir.4/13/11). The defendant subsequently withdrew his not guilty pleas and entered a plea of guilty to the vehicular homicide charge under Crosby, reserving the right to appeal the trial court’s ruling on the motion to suppress. See State v. Crosby, 338 So.2d 584 (La.1976). The other charges (counts 2-5) were nol-prossed. The defendant was sentenced to five years imprisonment at hard labor, with two years of the sentence suspended. Upon his release, the defendant is to be placed on supervised probation for five years. The defendant now appeals, designating one assignment of error. We reverse the trial court’s ruling denying the motion to suppress and vacate the conviction and sentence. The matter is remanded to the trial court for further proceedings.
FACTS
The following facts were developed at the motion to suppress hearing. On February 10, 2008, Louisiana State Trooper Jake Patín was dispatched to a vehicular crash site at the intersection of U.S. Hwy 190 at La. Hwy 423 in Erwinville. Trooper Patín observed a Chevrolet pickup truck overturned on its roof and a red car against the shoulder. Steven Collins, the driver of the red car, had been killed and was still in the driver’s seat. The three occupants of the truck had already been transferred to the hospital. Benjamin Wilkinson had been taken |ato Baton Rouge General Medical Center, and the defendant and Donald McGehee had been taken to Our Lady of the Lake Regional Medical Center. Through a license plate check, Trooper Patín learned the defendant was the owner of the truck. There is no evidence in the record that this information was ever communicated to Louisiana State Trooper Jeremy Ballard, who was the trooper that ordered the defendant’s blood drawn. It was also determined that the truck had caused the accident.
Trooper Patín went to Baton Rouge General to speak to Wilkinson about the crash. Trooper Ballard was sent to Our Lady of the Lake to speak to the defendant and McGehee. At this point in their investigations, the troopers did not know who was driving the truck when it crashed. At the hospital, Wilkinson was conscious, but unable to speak. Communicating with Trooper Patín by nodding his head, Wil *331 kinson consented to have his blood drawn; however, Trooper Patín never sought a response from Wilkinson regarding who was driving the truck at the time of the accident. At Our Lady of the Lake, McGehee was conscious and able to communicate. McGehee signed a consent form, allowing the withdrawal of his blood. Trooper Ballard never asked McGehee who was driving the truck at the time of the accident.
It appeared the defendant was unconscious when Trooper Ballard visited him. According to Trooper Ballard, the defendant was in “real bad condition, in critical condition.” Despite being unable to have the defendant sign a consent form because of his condition, Trooper Ballard had a nurse draw blood from the defendant. The defendant’s blood-alcohol concentration was .1 grams percent. Though it was still unknown who the driver of the truck was at the time the blood samples were taken, it was subsequently learned, days later, that the defendant was driving the truck.
1 ¿DISCUSSION
In his sole assignment of error, the defendant argues the trial court erred in denying his motion to suppress. Specifically, the defendant contends the results of the chemical test of his blood should have been suppressed because his blood was forcibly taken without a warrant, consent, or probable cause.
Trial courts are vested with great discretion when ruling on a motion to suppress. State v. Long, 03-2592, p. 5 (La.9/9/04), 884 So.2d 1176, 1179, cert. denied, 544 U.S. 977, 125 S.Ct. 1860, 161 L.Ed.2d 728 (2005). When a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court’s discretion, i.e., unless such ruling is not supported by the evidence. See State v. Green, 94-0887, p. 11 (La.5/22/95), 655 So.2d 272, 280-81. However, a trial court’s legal findings are subject to a de novo standard of review. See State v. Hunt, 09-1589, p. 6 (La.12/1/09), 25 So.3d 746, 751.
The Fourth Amendment to the United States Constitution and article I, § 5 of the Louisiana Constitution protect people against unreasonable searches and seizures. Subject only to a few well-established exceptions, a search or seizure conducted without a warrant issued upon probable cause is constitutionally prohibited. Once a defendant makes an initial showing that a warrantless search or seizure occurred, the burden of proof shifts to the State to affirmatively show it was justified under one of the narrow exceptions to the rule requiring a search warrant. See La. C. Cr. P. art. 703(D). A trial court’s ruling on a motion to suppress the evidence is entitled to great weight, because the district court had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Young, 06-0234, p. 6 (La.App. 1st Cir.9/15/06), 943 So.2d 1118, 1122, writ denied, 06-2488 (La.5/4/07), 956 So.2d 606.
|fiIn denying the motion to suppress at the suppression hearing, the trial court stated in pertinent part:
I have a fifty/fifty chance of getting this right. I believe I’m going to make — we’re making new law here, and I’m going to rule what I believe the Louisiana Supreme Court is going to rule, because I believe they’re going to say, but for this ruling and my rationale, that they could have zeroed in on in [sic] or two or three, but they didn’t know. They would have lost that opportunity to have learned whether the driver, which I believe — I believe there’s a belief that *332 he was driving, maybe not. Of course, that needs to be proved beyond a reasonable doubt, just like the intoxication.
The two statutory provisions addressed by the State and the defendant in their briefs are La. R.S. 32:661 and La. R.S. 32:666. Following are the relevant portions of those provisions as they appeared on the date of the incident:
§ 661. Operating a vehicle under the influence of alcoholic beverages or illegal substance or controlled dangerous substances; implied consent to chemical tests; administering of test and presumptions
A. (1) Any person, regardless of age, who operates a motor vehicle upon the public highways of this state shall be deemed to have given consent, subject to the provisions of R.S. 32:662, to a chemical test or tests of his blood, breath, urine, or other bodily substance for the purpose of determining the alcoholic content of his blood, and the presence of any abused substance or controlled dangerous substance as set forth in R.S. 40:964 in his blood if arrested for any offense arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle while believed to be under the influence of alcoholic beverages or any abused substance or controlled dangerous substance as set forth in R.S. 40:964.
(2)(a) The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person, regardless of age, to have been driving or in actual physical control of a motor vehicle upon the public highways of this state while under the influence of either alcoholic beverages or any abused substance or controlled dangerous substance as set forth in R.S. 40:964....
[[Image here]]
B. Any person who is dead, unconscious or otherwise in a condition rendering him incapable of refusal shall be deemed not to have withdrawn the consent provided by Subsection A of this section, and the test or tests may be administered subject to the provisions of R.S. 32:662.
|fi§ 666. Refusal to submit to chemical test; submission to chemical tests; exception; effects of
A. (l)(a)(i) When a law enforcement officer has probable cause to believe that a person has violated R.S. 14:98, R.S. 14:98.1, or any other law or ordinance that prohibits operating a vehicle while intoxicated, that person may not refuse to submit to a chemical test if he has refused to submit to such test on two previous and separate occasions of any previous such violation or in any case wherein a fatality has occurred or a person has sustained serious bodily injury in a crash involving a motor vehicle. A physician, physician assistant, registered nurse, emergency medical technician, chemist, nurse practitioner, or other qualified technician shall perform a chemical test in accordance with the provisions of R.S. 32:664 when directed to do so by a law enforcement officer.
The defendant in brief argues that the blood test administered on him was an unlawful violation of his person. According to the defendant, the prosecution had the burden of establishing the police had probable cause to believe he was the driver involved in the accident and that he was under the influence of alcohol or drugs. In support of this proposition, the defendant cites State v. Wells, 08-2262 (La.7/6/10), 45 So.3d 577. A public intoxi *333 cation case, we find Wells has no applicability to the instant matter.
The defendant in Wells, who was charged and convicted of possession of cocaine, was initially arrested for public intoxication and, upon a search incident to arrest, the arresting officer found crack cocaine on the defendant. Thus, the issue in Wells was whether the officer had probable cause to arrest the defendant based on the officer’s observation that the defendant appeared very intoxicated. In other words, unlike the unconscious defendant who was in a hospital before even being approached by a police officer and who had been involved in a vehicular crash, the defendant in Wells, while walking along the sidewalk, exhibited all of the outward signs and manifestations of being intoxicated, thereby giving the police officer probable cause to arrest him on the spot for public intoxication. Wells, 08-2262 at p. 3, 45 So.3d at 579-80.
|7In any event, the defendant points out correctly that law enforcement personnel did not determine who the driver of the truck was before having blood drawn from each of the occupants of that vehicle. The defendant also notes that under La. R.S. 32:666, a police officer must have probable cause to believe that a person has violated R.S. 14:98, 98.1, or any other law or ordinance that prohibits operating a vehicle while intoxicated before submitting that person to a chemical test. The defendant asserts the State’s reliance on La. R.S. 32:666 is misplaced because, by their own admission, the troopers indicated they did not have probable cause to believe the defendant was intoxicated at the time his blood was drawn. There is also no evidence in the record that Trooper Ballard, who ordered that the defendant’s blood be drawn, was ever told that the defendant was the owner of the truck that had caused the accident. Therefore, Trooper Ballard did not know at the time that the defendant owned the vehicle.
At the motion to suppress hearing, the troopers testified that at the time the blood was drawn, they had no knowledge or information of which of the three occupants of the truck had been driving at the time of the crash. They made no inquiry of the two conscious occupants of the vehicle about who was the driver. The troopers did not testify during the suppression hearing that they had any information or any evidence that alcohol or drugs were involved in the crash. For example, because the three injured occupants had all been moved to the hospital prior to the arrival of the troopers at the scene, there was no testimony about the driver being found or removed from the driver’s seat. Further, there was no testimony about beer cans or any other kind of alcohol (or drug) container being found in or near the truck; and no testimony about the smell of alcohol (or drugs) in the truck or the smell of alcohol on the occupants’ person or breath when the troopers went to the hospital to interview the occupants of the truck. Additionally, there is no evidence in the record that it was ever communicated to Trooper |SB aliar d, who ordered that the defendant’s blood be drawn, that the defendant owned the truck. Thus, it is clear that Trooper Ballard could not have had probable cause to believe that the defendant in particular was the driver of the truck nor that the driver had been intoxicated at the time he ordered the defendant’s blood to be drawn.
Under La. R.S. 32:661, implied consent to submit to a chemical test occurs only after the person has been “arrested for any offense arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle while believed to be under the influence of alcoholic beverages.” Sec *334 tion 661 is not applicable here because no one was arrested at the time the blood was taken and, as just noted, the officers had no reason to believe the driver was intoxicated. The State in brief argues the defendant was in effect placed “under arrest” at the hospital because of his extended restraint. In support of this position, the State cites State v. Caccioppo, 10-385 (La.App. 5th Cir.2/15/11), 61 So.3d 61.
Aside from the factual similarity in Caccioppo, wherein the defendant was taken to the hospital and had blood withdrawn while unconscious, we find this case inap-posite. In Caccioppo, the defendant’s vehicle was stopped in the middle of the street, blocking the right lane. The defendant was in the driver’s seat and unresponsive. The police officer at the scene found the defendant’s breathing shallow and her pulse slow. There was a strong odor of alcohol in the vehicle. The officer also found a water bottle in the center console that smelled highly of vodka. All this information led the officer to believe the defendant was intoxicated. He did not arrest her because of her medical condition and because he believed he did not have “enough to arrest her at that point.” The defendant was taken to the hospital. The officer went to the hospital with a blood alcohol kit, and a nurse drew blood from the defendant. Her BAC level was in excess of .5 grams |9percent. The officer obtained an arrest warrant and arrested her. Caccioppo, 10-385 at p. 3, 61 So.3d at 63.
Despite the officer having arrested the defendant after her BAC level was determined, the fifth circuit, in Caccioppo, found that the defendant was effectively placed “ ‘under arrest’ ” by the officer at the hospital before her blood was drawn because, even though unconscious, the defendant was effectively under the officer’s restraint at the hospital. Moreover, the officer had testified that had the defendant regained consciousness at the scene, he would have Mirandized[1] her and given her a field sobriety test. Thus, according to the fifth circuit, the defendant was “under arrest,” within the meaning of La. R.S. 32:661, when her blood was drawn. Caccioppo, 10-385 at p. 7, 61 So.3d at 65.
As noted, there were no such indices of intoxication, either at the scene or in the hospital, in the instant matter. The Caccioppo court seemed to suggest the defendant’s prolonged restraint may have constituted a de facto arrest, but only because of the officer’s testimony and the overwhelming signs of the defendant’s intoxication for which the officer in the first instance had probable cause to arrest. The defendant cites a similar case, State v. Sherer, 354 So.2d 1038 (La.1978), on which the Caccioppo court relied. But Sherer, like Caccioppo, involved those determining factors that make it readily distinguishable from the instant matter. The defendant in Sherer, after his truck crashed, was found by a trooper still in his truck unconscious. His breath smelled like alcohol, there were beer cans in the truck, and prior to the defendant being removed from the scene by ambulance, the trooper told the ambulance driver he was filing charges against the defendant based on the evidence, which indicated he had been driving while intoxicated. Sherer, 354 So.2d at 1040-42.
| inHaving no evidence of intoxication in the instant matter, the troopers could not have had reasonable grounds, as required under Section 661, to believe the defendant was “under the influence of alcoholic beverages or any abused substance or controlled dangerous substance.” Moreover, Section 661 is inapplicable because the troopers did not know who was the driver *335 of the truck. In both Caccioppo and Sherer, the driver was still in the vehicle when approached by the police.
Under the applicable part of La. R.S. 32:666(A)(l)(a)(i) that addresses implied consent when a fatality or serious bodily injury occurs in a crash involving a motor vehicle, a mandatory test for alcohol is required “[w]hen a law enforcement officer has probable cause to believe that a person has violated R.S. 14:98, R.S. 14:98.1, or any other law or ordinance that prohibits operating a vehicle while intoxicated.” Thus, just as with the inapplicability of Section 661 to this matter, so too is Section 666 inapplicable because the officers had no probable cause to believe the driver was intoxicated, a threshold finding to Section 666 being triggered.
Prior to the 2009 amendment. La. R.S. 32:681 provided in pertinent part:
§ 681. Postaccident drug testing; accidents involving fatalities, required
A. The operator of any motor vehicle which is involved in a collision in which a fatality occurs shall be deemed to have given consent to, and shall be administered, a chemical test or tests of his blood, urine, or other bodily substance for the purpose of determining the presence of any abused substance or controlled dangerous substance as set forth in R.S. 40:964 or any other impairing substance.
B. The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving or in actual physical control of a motor vehicle upon the public highways of this state which is involved in a collision in which a fatality occurs....
A central issue that runs throughout the defendant’s argument in brief with respect to La. R.S. 32:661 and La. R.S. 32:666 is whether Trooper Ballard, who had blood drawn from the unconscious defendant (the other two occupants of the |n truck had consented to have blood drawn), had reasonable grounds to believe he was the driver of the truck. While La. R.S 32:681 is not mentioned in either the State’s or the defendant’s briefs, the argument set forth by the defendant, namely that Trooper Ballard had no way of knowing the defendant was the driver and therefore could not properly have had blood drawn from him pursuant to Sections 661 and 666, is equally applicable to Section 681, given the similar purpose, language, and construction of these three sections.
The meaning and intent of a law is determined by considering the law in its entirety and all other laws concerning the same subject matter and construing the provision in a manner that is consistent with the express terms of the statute and with the obvious intent of the lawmaker in enacting it. The statute must therefore be applied and interpreted in a manner that is logical and consistent with the presumed fair purpose and intention the legislature had in enacting it. Courts should give effect to all parts of a statute and should not adopt a statutory construction that makes any part superfluous or meaningless, if that result can be avoided.
Champagne v. American Alternative Insurance Corporation, 12-1697, p. 6 (La.3/19/13), 112 So.3d 179, 183-184 (emphasis added; citations omitted).
The triggering event for the application of paragraph A of Section 681 (requiring the administration of a chemical test to determine the presence of any drug or other impairing substance[2]) is that the *336 operator of a vehicle is involved in a crash involving a fatality, regardless of whether intoxication was involved. However, paragraph B of Section 681 further provides an additional requirement for administration of the chemical test, and that is when the officer has “reasonable grounds” to believe that the person to be tested was the driver or person in actual physical control of the vehicle. “Reasonable grounds” is something less than probable cause. See Henry v. State, Department of Public Safety, 01-0103, p. 4 (La.App. 3d Cir.6/27/01), 788 So.2d 1286, 1289.
|12Based on the evidence presented at the suppression hearing, it was clear that Trooper Ballard, the officer who ordered the blood test, did not have reasonable grounds to believe the defendant, in particular, was the driver of the truck. Trooper Patín testified that through the truck license plate, registration, and insurance, he (i.e., Trooper Patín) learned the defendant was the owner of the truck. However, Trooper Patín did not testify that he shared this information with Trooper Ballard, and Trooper Ballard never testified that he knew who was the owner of the truck. The troopers never inquired of the other two occupants as to who was driving the vehicle. Thus, the only information Trooper Ballard had regarding the defendant was that he was one of the three people in the truck that crashed. Based on this evidence, the record clearly does not establish that Trooper Ballard had reasonable grounds to believe that the unconscious person before him at the hospital was the driver of the truck any more than either of the other two persons at the scene. As such, he lacked the authority to invoke La. R.S. 32:681 as grounds for ordering that the defendant’s blood be drawn and tested.
Therefore, we conclude that Trooper Ballard, the law enforcement officer ordering the blood test, did not have probable or reasonable cause to believe that the defendant, in particular, was the driver of the truck or that he was intoxicated. Accordingly, the defendant’s blood could not have been drawn legally under either La. R.S. 32:661, La. R.S. 32:666, or La. R.S. 32:681, and such seizure of the defendant’s blood by a nurse, at the behest of Trooper Ballard, violated the defendant’s right to privacy under Article I, Section 5 of the Louisiana Constitution and the right against an unreasonable search and seizure under both the Fourth Amendment to the United States Constitution and Article I, Section 5 of the | ^Louisiana Constitution.[3]
*337 The trial court erred in denying the motion to suppress. Accordingly, the trial court’s ruling on the motion to suppress is reversed, and the defendant’s conviction and sentence are vacated. The matter is remanded to the trial court for further proceedings.
RULING ON MOTION TO SUPPRESS REVERSED; CONVICTION AND SENTENCE VACATED; REMANDED FOR FURTHER PROCEEDINGS.
CRAIN, J., dissents and assigns reasons.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. An Attorney General opinion has stated with regard to Section 681(A), "while there is no *336 jurisprudence or statutory provisions that specifically define the phrase 'impairing substance,’ we opine that alcohol could be defined as an impairing substance.” La. Atty. Gen. Op. No. 08-0058.

. Similar to the matter before us, in a recent U.S. Supreme Court opinion involving a non-consensual warrantless blood draw, the police officer in that case ordered that the defendant's blood be drawn over the defendant’s objection and without a warrant "only because he believed it was not legally necessary to obtain a warrant.” Missouri v. McNeely, - U.S. -, 133 S.Ct. 1552, 1567, 185 L.Ed.2d 696 (2013). While the Court acknowledged that ”[i]t is true that as a result of the human body's natural metabolic processes, the alcohol level in a person’s blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated.” the Court nevertheless held that ‘‘[i]n those drunk driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so.” McNeely, - U.S. at -, 133 S.Ct. at 1560-61.
Further, with respect to searches involving intrusions beyond the body’s surface, the U.S. Supreme Court has recognized that “[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that de *337 sired evidence might be obtained. In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.” Schmerber v. California, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966).
Finally, the Court recognized in Mapp v. Ohio, 367 U.S. 643, 647, 81 S.Ct. 1684, 1687, 6 L.Ed.2d 1081 (1961) that in holding the exclusionary rule applicable to states, "constitutional provisions for the security of person and property should be liberally construed .... It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.” Therefore, "[t]he criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.” Mapp, 367 U.S. at 659, 81 S.Ct. at 1694.