ANN WALSH BRADLEY, J.
¶ 49. {dissenting). As the State has acknowledged, this case in essence presents a question of sufficiency of evidence.
¶ 50. Because we are a law developing court setting precedent for the entire state, we generally do not accept for review sufficiency of evidence cases because they often are tied to the unique facts of a particular case and thus have very limited preceden-tial value.
*28 f 51. Likewise, we generally eschew cases of statutory interpretation where the statute has subsequently changed because of the limited application of the decision. Nevertheless, in this case the majority tackles both circumstances and reverses the unpublished decision of the court of appeals.
¶ 52. The petitioner, State of Wisconsin, asserts that the court of appeals erred when it determined that the State failed to present sufficient evidence to show that the EMT was a "person acting under the direction of a physician" as required by statute.[1] It further contends that under the facts presented it has demonstrated that the blood draw was constitutionally reasonable under the Fourth Amendment of the United States Constitution.
f 53. The majority agrees with the State. Majority op., f ¶ 34, 48. However, it missteps in its analysis when construing the former statute by conflating the terms "direction" and "authorization," thereby sub silentio writing into the statute a word not used or intended by the legislature.
f 54. In determining that Kozel's blood draw satisfied statutory requirements and was constitutionally reasonable, the majority also errs when it excuses the failure of the State to present evidence sufficient to demonstrate that the EMT in this case was acting under the direction of a physician.
¶ 55. Contrary to the majority, I conclude that there is insufficient evidence to determine that the EMT-Intermediate technician who drew Kozel's blood was a "person acting under the direction of a physi *29 cian" as required by Wis. Stat. § 343.305(5)(b). Likewise, I determine that Kozel's blood draw was not constitutionally reasonable based upon the facts of record.
¶ 56. I would affirm the court of appeals and remand to the circuit court for further proceedings. Accordingly, I respectfully dissent.
I.
f 57. Wisconsin s implied consent statute authorizes legal blood draws in order to obtain evidence of intoxication. Section § 343.305(5)(b) provides in relevant part that "[b]lood may be withdrawn... to determine the presence or quantity of alcohol. . . only by a physician, registered nurse, medical technologist, physician assistant or person acting under the direction of a physician." In this case, Kozel's blood was drawn by an EMT-Intermediate Technician ("the EMT") in a pre-booking room in the Sauk County Jail.
¶ 58. The State asserts that there was sufficient evidence to support the requirement that the EMT was a "person acting under the direction of a physician" pursuant to Wis. Stat. § 343.305(5)(b). The majority embraces the State's position.
¶ 59. In interpreting the statute, the majority relies on a plain meaning analysis of the term "direction." Majority op., ¶ 35. Initially it follows the court of appeals approach, adopting the dictionary definition which requires "guidance or supervision of action, conduct or operation." Id. However, it rejects the court of appeals conclusion that there is insufficient evidence in this record to show that the EMT was a "person acting under the direction of a physician." Majority op., ¶¶ 35-39 (citing Webster's Third New International Dictionary 640 (1993)).
*30 f 60. The majority reasons that "[t]he concept of 'direction' reasonably contemplates varying degrees of proximity between a director and the person whose actions he or she guides rather than a single, set relationship applicable in all cases." Majority op., ¶ 37. I agree.
¶ 61. However, it proceeds next to set up a straw-man only to subsequently knock it down when it concludes that "[h]ad the legislature envisioned only one manner of'direction,' it would have spelled out the specific procedures that a physician and the person he or she directs must follow to meet that requirement." Id. According to the majority, "[w]e will not read into the statute a limitation the plain language does not evidence." Majority op., ¶ 39 (quoting Cty. of Dane v. LIRC, 2009 WI 9, ¶ 33, 315 Wis. 2d 293, 759 N.W.2d 571).
¶ 62. No one even attempts to advance an argument that the statute should be read in such a limited fashion. Not the defendant, not the court of appeals and certainly not this dissent.
¶ 63. Rather, what needs to be done, and what the majority skirts by setting up the fabricated argument, is an examination of whether the evidence presented here demonstrates that the EMT was acting under the physician's direction, that is, under the "guidance or supervision of action, conduct or operation."
¶ 64. Although this court often resorts to using dictionary definitions when engaging in statutory construction, we also often find guidance by looking at how other courts have defined the same statutory language. In People v. Gregg, the Illinois court of appeals interpreted the statutory phrase "acting under *31 the direction of a physician" in a similar context to this case.[2] 526 N.E.2d 537, 539 (Ill. App. Ct. 1988).
f 65. The Illinois court of appeals defined "acting under the direction" of a physician to mean that:
[W]ork is performed under the guidance and direction of a supervisor who is responsible for the work, who plans work and methods, who is available on short notice to answer questions and deal with problems that are not strictly routine, who regularly reviews the work performed, and who is accountable for the results.
Id. (citing 77 Ill. Am. Code 300.330, 330.330, 350.330, 370.240, 390.330 (1985)).
¶ 66. The physician in Gregg was not present when a trained phlebotomist performed a blood draw, but was "responsible for supervising emergency room procedures." Id. at 538. Thus, Gregg concluded that "[i]n light of the complex and extensive procedures already required in performing a blood analysis," a trained phlebotomist acting under a physician's supervision sufficiently ensured the accuracy and uniformity of blood analysis. Id. at 539.
¶ 67. Armed with the dictionary definition of "direction" and further informed by Gregg's interpretation of the statutory phrase, I normally would turn next to an examination of whether the evidence here is sufficient to meet the statutory directive.
¶ 68. Yet, I would be remiss to ignore an additional impediment in the majority's statutory analysis. *32 It missteps when it conflates the statutory term "direction" with a distinctly different term "authorization."
¶ 69. As set forth more fully above, "direction" requires guidance and supervision. The plain meaning of "authorize" is defined as "to give permission for (something); sanction."[3] American Heritage Dictionary of the English Language 120 (5th ed. 2011). Despite this distinction between "direction" and "authorization," in determining that the EMT was acting under the direction of a physician, the majority relies almost entirely on the fact that he was authorized by Dr. Mendoza to draw blood. See e.g., majority op., f 36 ("The evidence below showed that Dr. Mendoza, the medical 'director' of BDAS of at least seven years, specifically 'authorized a standing order' for BDAS EMT intermediate technicians such as Kozel to perform blood draws when requested to do so by law enforcement. . . . Dr. Mendoza's authorization was formalized in writing. . . .") (emphasis added); see also majority op., ¶¶ 2, 15, 38.[4]
f 70. The majority relies upon an August 21, 2009 letter written by Dr. Mendoza, the Medical Director for the Baraboo District Ambulance Service, which *33 authorized the EMT to perform the blood draws at the request of law enforcement. Specifically, Dr. Mendoza's letter "authorized a standing order for the EMT-Paramedics and approved EMT-Intermediate Technicians authority to draw legal blood draws at the request of law enforcement officers." It further states that "[t]he Baraboo District Ambulance Services EMT-Paramedics and EMT-Intermediate Technicians are acting under the direction of my physician license."
¶ 71. As the court of appeals in this case explained, evidence that an EMT was authorized to act under a physician's license is not evidence that the EMT was acting under the physician's direction. State v. Kozel, No. 2015AP656-CR, unpublished slip op., ¶ 13 (Wis. Ct. App. Nov. 12, 2015). Dr. Mendoza's letter authorizes EMTs to conduct blood draws because it grants them the authority to do so at the request of law enforcement. However, it tells us nothing about the physician's guidance or supervision of the EMT's actions when conducting a blood draw.
¶ 72. The distinction between "directed" and "authorized" is further supported by recent changes to the statutory provision at issue here. Pursuant to 2013 WI Act 224, the legislature amended section 343.305(5)(b) to include medical professionals who are authorized to draw blood as a distinct category from a "person acting under the direction of a physician." Under the amended statute, a blood draw may now be performed by authorized medical professionals:
Blood may be withdrawn... to determine the presence or quantity of alcohol.. . only by a physician, registered nurse, medical technologist, physician assistant, phlebotomist, or other medical professional who is authorized to draw blood, or person acting under the direction of a physician.
*34 Wis. Stat. § 343.305(5)(b) (2013-14) (emphasis added).
f 73. According to the Wisconsin Legislative Council Act Memorandum for 2013 Wis. Act 224, the 2011-2012 version of the statute at issue in this case provided that only individuals "acting under the direction of a physician could draw blood." Conversely, the amended statute now allows a phlebotomist or other medical professional who is authorized to draw blood, in addition to the other health care providers listed under prior law:
Under prior law, only a physician, registered nurse, medical technologist, physician assistant, or personal acting under the direction of a physician could draw blood for alcohol or controlled substance testing.
Act 224 allows a phlebotomist or other medical professional who is authorized to draw blood, in addition to the other health care providers listed under prior law, to draw blood for alcohol or controlled substance testing.
Wisconsin Legislative Council Act Memorandum for 2013 Wis. Act 224 (April 14, 2014), available at http:// docs.legis.wisconsin.gov/2013/related/lcactmemo/act224.
¶ 74. This statutory change suggests that the EMT in this case, who was formerly not permitted to draw blood under the statute unless "acting under the direction of a physician," now may be permitted to draw blood under the statute if he qualifies as an other medical professional who is authorized to draw blood.
f 75. Unlike the newly amended statute, the 2011-12 version of the statute that is the subject of our analysis here uses the term "direction" but not the term "authorize." In conflating the two terms in its *35 analysis, the majority is sub silencio writing into the prior statute terms not then used or intended by the legislature.
II
¶ 76. Perhaps because the majority conflates direction" with "authorization," it incorrectly concludes that there was sufficient evidence that the EMT was acting under the direction of a physician as required by Wis. Stat. § 343.305(5)(b). This misstep allows the majority to disregard the lack of evidence presented in this case in contrast to evidence deemed sufficient in other similar cases.
f 77. In State v. Penzkofer, 184 Wis. 2d 262, 265, 516 N.W.2d 774 (Ct. App. 1994), a certified laboratory technician performed a blood draw in a hospital, but without a physician present in the room at the time of the blood draw. However, the hospital pathologist testified that the technician performed laboratory functions under his general supervision and direction. Id.
¶ 78. Significantly, the physician identified a written hospital protocol setting forth the detailed procedures that guided a technician performing a blood draw. Id. These procedures were reviewed and revised, and the protocol was dated and signed by the physician. Id. The physician testified that he did not "stand over [the technician's] shoulder" because "[t]hen I might as well draw it myself... or I'm busy with other work ... so I couldn't be two places at one time." Id.
f 79. Considering the evidence of written procedures and protocols that were reviewed in a hospital setting by a physician, the Penzkofer court concluded that "the procedure used here meets the legislature's concern for testing in such a manner as to yield *36 reliable and accurate results. Id. at 266. It explained that "[h]ospital laboratories are subject to detailed and stringent standards in almost every aspect of their facilities and services." Id. (citing Wis. Admin. Code § HSS 124.17). Penzkofer reasoned further that "[t]he certified lab assistant followed a written protocol approved and kept current by the pathologist." Id. (emphasis added).
¶ 80. The court of appeals concluded that "Penz-kofer's concern for safety and accuracy are addressed by those standards as well as the procedures in place here." Id. Conversely, the majority opinion neglects to consider how the lack of protocols setting forth detailed procedures for performing a blood draw, as well as the lack of detailed sanitation standards governing blood draws at the jail, might undermine confidence in the safety and accuracy of Kozel's blood drawn.
f 81. Additionally, unlike here, in another unpublished case involving a blood draw performed by an EMT at the Sauk County jail, the State presented evidence of written protocols and procedures that guided the technician. In State v. Heath, No. 2014AP2466-CR, unpublished slip op., ¶ 5 (Wis. Ct. App. Sept. 15, 2016), the State introduced a letter from the paramedic program coordinator for the Department of Health Services ("DHS") that "approved the Baraboo District Ambulance Service's revised and updated protocol for legal blood draws, and which authorized the ambulance service to implement the protocol."
¶ 82. Even in cases where written protocols setting forth detailed procedures were not introduced, the State presented significantly more evidence of direction by a physician than was introduced here. As explained above, "direction" requires "guidance or supervision of action." See also Gregg, 526 N.E.2d at 539 *37 (concluding that there was sufficient evidence of direction when a supervising physician planed work and methods, was available on short notice, regularly reviewed the work performed, and was accountable for the results).
¶ 83. For example, in State v. Osborne, No. 2012AP2540-CR, unpublished slip op., ¶ 19 (Wis. Ct. App. June 27, 2013), the EMT testified that he was "operating under the supervision of a physician, that a physician 'signed off on the performance of the EMT's duties, that the EMT was in at least monthly contact with that physician, and that the EMT could be in contact with that physician at any time if the need arose." Accordingly, the blood draw was performed under the direction of a physician because he regularly reviewed the work performed and was accountable for the results.
¶ 84. Contrary to Penzkofer and other unpublished cases such as Heath and Osbourne, the facts in the record here demonstrate an absence of direction by a physician, including an absence of written protocols setting forth the detailed procedures that the EMT must follow when performing a blood draw. Here, the only evidence introduced was the testimony of the EMT and Dr. Mendoza's letter. When asked about whether there were written protocols setting forth procedures for performing a blood draw, the EMT equivocated and could not identify any. He responded "[Regarding the blood draw, I would have to check."
¶ 85. In other cases, even where detailed procedures were not introduced, there was testimony that the EMT had regular contact with the supervising physician who took responsibility for the EMT's work. See, e.g., Osborne, No. 2012AP2540-CR, unpublished slip op., ¶ 19. The EMT in Osbourne testified that he *38 was in at least monthly contact with the supervising physician. Id. Unlike Osbourne where the EMT testified that the supervising physician signed off on the performance of his duties, the EMT in this case testified that he had never spoken to Dr. Mendoza about the letter authorizing him to conduct blood draws. Rather, the EMT testified only that Dr. Mendoza "occasionally show[ed] up" at his place of work. Absent from the record is any indication that when Dr. Mendoza occasionally appeared that the EMT had any contact whatsoever with the physician—let alone any supervision or guidance from him.
¶ 86. Contrary to the majority's assertion, the facts in the record demonstrate a total absence of guidance and supervision necessary to support a determination that the EMT here was acting under the direction of a physician:
• The State did not introduce into evidence any protocols or procedures guiding blood draws by an EMT.
• There are no protocols to ensure that the jail's blood draw room is sterile or meets the appropriate standard.
• Dr. Mendoza did not train the EMT.
• Dr. Mendoza had never been to the jail nor inspected the room where blood is drawn at the jail.
• Dr. Mendoza never witnessed the EMT perform any blood draws.
• There is no evidence that Dr. Mendoza approved or supervised the EMT's blood draw techniques on a regular or even irregular basis.
• There is no evidence that the EMT had regular or even irregular contact with Dr. Mendoza.
*39 ¶ 87. In short, no evidence was presented of any supervision of this EMT by Dr. Mendoza, whether it be general or direct. Additionally, there is a dearth of evidence demonstrating any guidance by Dr. Mendoza. Thus, contrary to the majority, I conclude that there is insufficient evidence to determine that the EMT-Intermediate who drew Kozel's blood was a "person acting under the direction of a physician." Wis. Stat. § 343.305(5)(b).
III
¶ 88. Given the state of the evidentiary record, I turn next to examine whether the blood draw here was constitutionally reasonable under the Fourth Amendment of the United States Constitution, which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated . . .
f 89. In the context of a blood draw, the United States Supreme Court has explained that "[t]he integrity of an individual's person is a cherished value of our society." Schmerber v. California, 384 U.S. 757, 772 (1966). Accordingly, the "overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." Id. at 767.
¶ 90. The Fourth Amendment does not prohibit all intrusions, however, but only those which are not justified under the circumstances or are made in an improper manner. Id. at 768. Thus, the question in Schmerber, as in this case, was whether "the means and procedures employed in taking D blood respected relevant Fourth Amendment standards of reasonableness." Id.
*40 ¶ 91. Relying on Schmerber, the majority contends that "[t]he blood test procedure has become routine in our everyday life" and "that for most people the procedure involves virtually no risk, trauma or pain." Majority op., ¶ 42 (citing 384 U.S. at 771). The majority does not acknowledge, however, that the United States Supreme Court has recently emphasized the serious nature of a blood test.
¶ 92. In Birchfield v. North Dakota, 136 S. Ct. 2160, 2178 (2016), the Supreme Court explained that "[b]lood tests are a different matter [from breath tests]. They 'require piercing the skin1 and extract a part of the subject's body." (citations omitted). As Birchfield reasoned, although many people submit to blood draws, "the process is not one they relish." Id. Additionally, the Birchfield court noted that blood samples "can be preserved and from which it is possible to extract information beyond a simple BAC reading." Id.
¶[ 93. Ignoring the serious and intrusive nature of a blood draw, the majority asserts that "[t]he important point for constitutional purposes is that the evidence demonstrated that [the EMT] was thoroughly trained and experienced in properly drawing blood." Majority op., ¶ 44. Schmerber was explicit, however, that "we reach this judgment only on the facts of the present record." 384 U.S. at 772. Thus, it warned that in other circumstances, such as a blood draw administered at a jail, may not be constitutionally reasonable:
Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search . . . were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To *41 tolerate searches under these conditions might invite an unjustified element of personal risk of infection and pain.
Id. at 771-72.
¶ 94. In State v. Daggett, 2002 WI App 32, ¶¶ 8-15, 250 Wis. 2d 112, 640 N.W.2d 546, the Wisconsin court of appeals addressed whether under Schmerber, a warrantless blood draw performed by a doctor in a police booking room was reasonable under the Fourth Amendment. The majority parses Daggett, citing it only once for the proposition that a constitutionally reasonable blood draw can take place in a non-medical setting. Majority op., ¶ 45. It does not, however, analyze where this case falls on the spectrum of reasonableness set forth in Daggett.
f 95. Daggett moved to suppress the results of the blood test on the grounds that the blood draw was unlawful because it took place in the county jail booking room, rather than in a hospital. Daggett, 250 Wis. 2d 112, f 5. The Daggett court concluded that "the method used to take the blood sample was a reasonable one and was performed in a reasonable manner." Id., ¶ 14.
¶ 96. According to the Daggett court, "[rjather than establishing a bright-line rule, Schmerber recognized a spectrum of reasonableness." Id., ¶ 15. It explained that a blood draw by a medical professional in a medical setting is generally reasonable, but blood withdrawn by a non-medical professional in a non-medical setting would raise "serious questions" of reasonableness. Id. (citation omitted). Thus, under Daggett, a blood draw "in a jail setting may be unreasonable if it 'invites an unjustified element of personal risk of infection and pain.'" Id., ¶ 16 (citing Schmer-ber, 384 U.S. at 772).
*42 f 97. Under Daggett's spectrum of reasonableness, the blood draw here falls below the standard of anything that has previously been determined to be reasonable. In Schmerber, the blood draw was performed by a physician in a hospital. 384 U.S. at 758. The blood draw in Daggett took place in a jail, but was performed by a physician. 250 Wis. 2d 112, ¶ 4. In this case, Kozel's blood draw was performed by an EMT-Intermediate in a jail.
¶ 98. As such, this case represents the latter end of the Daggett spectrum of reasonableness. Although a blood draw by an EMT in a jail may not be per se unreasonable, it is unreasonable under the facts of this case. As set forth above, there is no evidence of any written protocols or procedures in the record. Dr. Mendoza did not train the EMT, had never witnessed him perform a blood draw, nor had he ever approved of his blood draw techniques.
¶ 99. Additionally, there are no protocols to ensure that the jail's blood draw room is sterile. Admittedly, the EMT testified that the pre-booking room looked clean. However, the pre-booking room where the blood draw was administered was also used to perform breathalyzer tests on those arrested for drunk driving and for miscellaneous storage. According to the evidence, Dr. Mendoza had never been to the jail let alone inspected the pre-booking room where blood is drawn.
f 100. Other than testimony regarding the fact that jail staff have a schedule for cleaning, which is initialed by the cleaner and posted on the wall, there is no other evidence that the pre-booking room in the jail meets the high sanitary standards of a hospital. To the contrary, such an initialed and posted cleaning sched *43 ule is akin to those found in many department or convenience store restrooms.
¶ 101. For example, the Wisconsin Administrative Code requires that hospitals maintain a sanitary environment, that sterilizing services be available at all times, and that a committee be established at each hospital to implement measures to make sure infections do not spread. Wis. Admin. Code DHS § 124.08(2), (4)(b) and (e). The rules for jails are less stringent, requiring only monthly sanitation inspections. Wis. Admin. Code DOC § 350.12(13).
¶ 102. It is a well-established principle that "[i]t is the duty of courts to be watchful for the constitutional rights of the citizen, and against stealthy encroachments thereon." Schneckloth v. Bustamonte, 412 U.S. 218, 229 (1973) (citation omitted). Permitting blood draws in a jail without written protocols and procedures could erode Fourth Amendment protections beyond what was contemplated in Schmerber and Daggett.
¶ 103. Given the absence of written protocols and procedures, the record here lacks the same evidence of safety and accuracy present in cases in which a blood draw has been determined to be constitutionally reasonable. Thus, I determine that the evidentiary record is insufficient to conclude that the blood draw administered here was performed in a constitutionally reasonable manner.
f 104. For the reasons set forth above, I respectfully dissent.
1 105. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

 77 Ill. Adm. Code 510.110(a)(2) (1985) provides in relevant part:
The blood sample shall be collected per venipuncture by a physician licensed to practice medicine by a registered nurse or by a trained phlebotomist acting under the direction of a licensed physician (emphasis added).

 The majority does not include the definition of "authorize" in its opinion.

 Majority op., ¶ 2 ("The EMT was authorized in writing by a physician to draw blood when asked to do so by law enforcement."); majority op., ¶ 15 ("The State introduced into evidence... '[A] letter from Dr. Mendoza to our staff, our administration stating that the authorized EMT paramedics and intermediate technicians may perform legal blood draws.'"); majority op., ¶ 38 (" . . . Dr. Mendoza issued a standing order authorizing EMTs to draw blood when requested to do so by law enforcement.").